Patrick R. Leverty
**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

[Additional counsel on signature block]

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

ANDREW TURESKY, derivatively on behalf of
LAS VEGAS SANDS CORP.,

      Plaintiff,

      vs.

SHELDON G. ADELSON,
PATRICK DUMONT, ROBERT G.
GOLDSTEIN, IRWIN CHAFETZ,
MICHELINE CHAU, CHARLES D. FORMAN,
STEVEN L. GERARD, GEORGE JAMIESON,
CHARLES A. KOPPELMAN,
LEWIS KRAMER, and DAVID F. LEVI,

      Defendants,

      and

LAS VEGAS SANDS CORP.,

      Nominal Defendant.

Case No.:

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Andrew Turesky ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on

behalf of Nominal Defendant Las Vegas Sands Corp. ("LVSC" or the "Company"), files this Verified

Shareholder Derivative Complaint against Individual Defendants Sheldon G. Adelson ("Adelson"), Patrick Dumont ("Dumont"), Robert G. Goldstein ("Goldstein"), Irwin Chafetz ("Chafetz"), Micheline Chau ("Chau"), Charles D. Forman ("Forman"), Steven L. Gerard ("Gerard"), George Jamieson ("Jamieson"), Charles A. Koppelman ("Koppelman"), Lewis Kramer ("Kramer"), and David F. Levi ("Levi") (collectively, the "Individual Defendants" and together with LVSC, the "Defendants") for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of LVSC, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LVSC, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by LVSC's directors, officers, and/or controlling shareholders from February 26, 2016 through September 15, 2020 (the "Relevant Period").

2.      LVSC is a Fortune 500 company based in Nevada which owns and operates integrated resorts that feature casinos at the core of the Company's properties located in Las Vegas, Nevada; Macao, China; and Singapore. In Singapore, LVSC owns and operates the Marina Bay Sands, which

Verified Amended Shareholder Derivative Complaint

has become one of Singapore's major tourist, business and retail destinations since its opening in 2010.

3.      The Company has been operating since 1988, when Defendant Adelson, currently among the world's wealthiest individuals, began building his hospitality and gaming empire. However, it wasn't until August 2004 that LVSC went public. Two years later, in August 2006, LVSC entered into a development agreement with the Singapore Tourism Board to design, develop, construct and operate the Marina Bay Sands (the "Development Agreement").

4.      In accordance with the Development Agreement, the Casino Control Act, and other applicable federal, state, and local laws and regulations, LVSC is required to maintain strict casino control measures. The Company's casino control measures are of particular importance as an indicator of the integrity of the Company's operations, as well as its overall business performance.

5.      Throughout the Relevant Period, in breach of their fiduciary duties, the Individual Defendants failed, in their role as directors and/or officers, to exercise adequate supervision, oversight, or control of the Company and caused the Company to, *inter alia*: (1) forge transfer authorization documents by filling in payment details on pre-signed or photo-copied authorization forms; (2) conceal illicit transfers by destroying evidence such as original transfer documents; and (3) transfer more than $1 billion of patron funds to third parties without consent in breach of the Development Agreement and potential violation of the Company's anti-money laundering procedures and applicable law (the "Fraudulent Money Transfer Scheme").

6.      During the Relevant Period, the Company's casino control measures contained certain material deficiencies related to the transfer of patron funds. As such, and as investigations would eventually reveal, the Company's casino control measures were not adequately implemented or maintained. These deficiencies also indicated that the Company lacked effective internal controls over its financial reporting.

7.     The Individual Defendants concealed the existence of these control failures from the investing public, instead affirmatively representing throughout the Relevant Period that the Company maintained effective disclosure controls and internal controls over its financial reporting.

8.     The truth began to emerge on July 19, 2020, when *Bloomberg News* reported that the Company had agreed to settle a lawsuit brought by a former patron, Wang Xi ("Xi"), who had alleged LVSC's casino in Singapore illegally transferred millions of dollars to other patrons without his approval (the "Xi Lawsuit"). Further, the article revealed that both Singapore's Casino Regulatory Authority (the "CRA") and the U.S. Department of Justice ("DOJ") opened investigations to determine whether LVSC breached anti-money laundering procedures or otherwise abused internal financial controls in violation of local and/or federal law.

9.     On this news, the price of the Company's stock dropped from $48.69 per share at the close of trading on July 17, 2020, the prior trading day, to $47.28 per share at the close of trading on July 20, 2020, representing a loss in value of nearly 2.9%, or $1.41 per share.

10.     Subsequently, on September 16, 2020, *Bloomberg News* published another article which revealed that LVSC had hired a law firm to conduct an internal investigation into employee transfers of more than $1 billion in patron money to third parties. Further, the article revealed that Singapore's CRA had concluded that there were "weaknesses" in the Company's casino control measures pertaining to fund transfers at its Singapore casino, Marina Bay Sands, and that it had directed the Company to "strengthen its control measures." *Bloomberg News* also reported that Hogan Lovells, a law firm that had conducted a probe of the Company in 2019, had concluded that the Fraudulent Money Transfer Scheme "failed to draw the requisite attention" from LVSC and that there were instances of employees forging transfer authorization documents and then destroying originals. According to the investigation, more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties worth about

S$1.4 billion between 2013 and 2017. Finally, the article revealed that the Company had stated to regulators that LVSC had "strengthened its control process" in April 2018.

11.     On this news, the price of the Company's stock dropped from $51.85 per share at the close of trading on September 15, 2020, to $49.67 per share at the close of trading on September 16, 2020, representing a loss in value of roughly 4.2%, or $2.18 per share, on heavy trading volume.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective casino control measures, specifically related to the transfer of patron funds and, as a result, LVSC's casino control measures related to the transfer of patron funds in its Marina Bay Sands casino located in Singapore contained material weaknesses and deficiencies in breach of the Development Agreement; (2) as a result, LVSC's Marina Bay Sands casino located in Singapore faced an increased risk of the Fraudulent Fund Transfer Scheme; (3) the Fraudulent Fund Transfer Scheme; (4) consequently, the Company was subject to an elevated threat of both investigation and legal action in connection to the Fraudulent Fund Transfer Scheme and also faced heightened regulatory scrutiny and oversight including in Singapore and the United States; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

13.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public, while at least one of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of over $13.6 million.

Verified Amended Shareholder Derivative Complaint

14.     In further breach of their fiduciary duties, the Individual Defendants either engaged in and/or permitted, and/or allowed the Company to engage in the Fraudulent Money Transfer Scheme.

15.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. More than 33.7 million shares of the Company's common stock were repurchased between February 2017 and December 2019 for over $2.0 billion. As the Company stock was actually only worth $49.67 per share, the low price it reached during trading on September 16, 2020, the Company overpaid nearly $357.6 million in total.

16.     In light of the Individual Defendants' misconduct, which has subjected LVSC to the Xi Lawsuit, which the Company settled for approximately $6.5 million, and LVSC its Chairman and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuits pending in the United States District Court for the District of Nevada (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

17.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the substantial likelihood of the CEO's and Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## **JURISDICTION AND VENUE**

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

19.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and countries and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Nevada or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.     Venue is proper in this District because LVSC is incorporated in and headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

25.     Plaintiff is a current shareholder of LVSC. Plaintiff has continuously held LVSC common stock since 2010. Plaintiff is a citizen of The People's Republic of China.

**Nominal Defendant LVSC**

26.     LVSC is a Nevada corporation with its principal executive offices at 3355 Las Vegas Boulevard South, Las Vegas, Nevada 89109. LVSC's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "LVS."

**Defendant Adelson**

27.     Defendant Adelson is the founder of the Company, and has served as the Company's Chairman, CEO, and Treasurer since August 2004. According to the Company's Schedule 14A filed with the SEC on April 1, 2020 (the "2020 Proxy Statement"), as of March 16, 2020, Defendant Adelson beneficially owned 79,477,424 shares of the Company's common stock, which represented 10.4% of the Company's outstanding stock as of that date making him a controlling shareholder.[1] Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Adelson owned over $3.2 billion worth of LVSC stock.

28.     For the fiscal year ended December 31, 2019, Defendant Adelson received $24,680,118 in compensation from the Company. This included $5,000,000 in salary, $1,000,000 in option awards, $12,500,000 in non-equity incentive plan compensation, and $6,180,118 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Adelson received $24,012,913 in compensation from the Company. This included $5,000,000 in salary, $1,000,000 in option awards, $12,500,000 in non-equity incentive plan compensation, and $5,512,913 in all other compensation. For the fiscal year ended

---

[1] As of March 16, 2020, Defendant Adelson, together with his wife, Dr. Miriam Adelson and their family members, beneficially owned 432,360,530 shares of the Company's common stock, which represented 56.6% of the Company's outstanding common stock as of March 16, 2020.

Verified Amended Shareholder Derivative Complaint

December 31, 2017, Defendant Adelson received $26,086,499 in compensation from the Company. This included $5,000,000 in salary, $1,380,870 in stock awards, $2,825,000 in option awards, $12,500,000 in non-equity incentive plan compensation, and $4,380,629 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Adelson received $12,707,449 in compensation from the Company. This included $1,000,000 in salary, $1,816,042 in stock awards, $1,825,000 in option awards, $4,335,341 in non-equity incentive plan compensation, and $3,731,066 in all other compensation.

29.     The Company's 2020 Proxy Statement stated the following about Defendant Adelson:

Mr. Adelson is our founder. Mr. Adelson's exclusive experience, especially in the hospitality and MICE businesses, and his role as our Chief Executive Officer and Treasurer, led the Board to conclude he would be a valuable member of our Board of Directors.

Mr. Adelson has been Chairman of the Board, Chief Executive Officer, Treasurer and a Director of the Company since August 2004. He has been chairman of the board, chief executive officer and a director of Las Vegas Sands, LLC (or its predecessor, Las Vegas Sands, Inc.) since April 1988 when it was formed to own and operate the former Sands Hotel and Casino. Mr. Adelson has served as the chairman of the board of directors of the Company's subsidiary, Sands China Ltd., since August 2009 and as its chief executive officer since January 2015. Mr. Adelson also created and developed The Sands Expo and Convention Center, the first privately owned convention center in the United States, which was transferred to the Company in July 2004. In addition, Mr. Adelson serves as an officer and/or director of several of our other subsidiaries. His business career spans more than seven decades and has included creating and developing to maturity more than 50 different businesses. Mr. Adelson has extensive experience in the convention, trade show, and tour and travel businesses. He created and developed the COMDEX Trade Shows, including the COMDEX/Fall Trade Show, which was the world's largest computer show in the 1990s. He has been the president and chairman of Interface Group Holding Company, Inc. and its predecessors since the mid-1970s and is a manager of Interface Group-Massachusetts, LLC and was president of its predecessors since 1990. Mr. Adelson has earned multiple honorary degrees and has been a guest lecturer at various colleges and universities, including the University of New Haven, Harvard Business School, Columbia Business School, Tel Aviv University and Babson College. Among his numerous awards for his business and philanthropic work are the Armed Forces Foundation's Patriot Award, the Hotel Investment Conference's Innovation Award and the Woodrow Wilson Award for Corporate Citizenship, and induction into the American Gaming Association's Hall of Fame.

30.     Upon information and belief, Defendant Adelson is a resident of Nevada.

**Defendant Dumont**

31.     Defendant Dumont has served as the Company's Executive Vice President and CFO since March 2016 and a Company director since April 2017. Defendant Dumont has also served as the Company's Principal Financial officer since February 23, 2016. Previously, he served as the Company's Senior Vice President, Finance and Strategy from September 2013 until March 2016 and as the Company's Vice President, Corporate Strategy from June 2010 until August 2013. Mr. Dumont is the son-in-law of Defendant Adelson. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Dumont beneficially owned 350,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Dumont owned approximately $14.1 million worth of LVSC stock.

32.     For the fiscal year ended December 31, 2019, Defendant Dumont received $2,413,388 in compensation from the Company. This included $1,200,000 in salary, $1,200,000 in non-equity incentive plan compensation, and $13,388 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Dumont received $2,412,952 in compensation from the Company. This included $1,200,000 in salary, $1,200,000 in non-equity incentive plan compensation, and $12,952 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Dumont received $1,200,000 in compensation from the Company. This included $1,200,000 in salary, $1,200,000 in non-equity incentive plan compensation, and $103,792 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Dumont received $8,920,217 in compensation from the Company. This included $1,200,000 in salary, $6,552,000 in option awards, $1,141,200 in non-equity incentive plan compensation, and $27,017 in all other compensation.

33.     The Company's 2020 Proxy Statement stated the following about Defendant Dumont:

Mr. Dumont's experience in corporate finance and his positions and tenure with the Company led the Board to conclude he would be a valuable member of our Board of Directors.

Mr. Dumont has been a Director of the Company since April 2017. Mr. Dumont has been the Company's Executive Vice President and Chief Financial Officer since March 2016 and was our Senior Vice President, Finance and Strategy from September 2013 through March 2016. In addition, Mr. Dumont has served as the Company's Principal Financial Officer since February 23, 2016. From June 2010 until August 2013, Mr. Dumont served as the Company's Vice President, Corporate Strategy.

34.    Upon information and belief, Defendant Dumont is a resident of Nevada.

**Defendant Goldstein**

35.    Defendant Goldstein has served as the Company's President and Chief Operating Officer and as a Company director since January 2015. Defendant Goldstein joined the Company in 1995. Previously, he served as the Company's President of Global Gaming Operations from January 2011 until December 2014, as the Company's Executive Vice President from July 2009 until December 2014, and as the Company's Secretary from August 2016 until November 2016. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Goldstein beneficially owned 2,387,057 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Goldstein owned over $96.4 million worth of LVSC stock.

36.    For the fiscal year ended December 31, 2019, Defendant Goldstein received $8,333,800 in compensation from the Company. This included $3,400,000 in salary, $3,400,000 in non-equity incentive plan compensation, and $1,533,800 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Goldstein received $24,668,472 in compensation from the Company. This included $3,400,000 in salary, $15,875,000 in option awards, $3,400,000 in non-equity incentive plan compensation, and $1,993,472 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Goldstein received $8,143,765 in compensation from the Company. This included $3,400,000 in salary, $3,400,000 in non-equity incentive plan compensation, and $1,343,765 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Goldstein received $8,204,243 in

compensation from the Company. This included $3,400,000 in salary, $3,233,400 in non-equity incentive plan compensation, and $1,570,843 in all other compensation.

37.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Goldstein made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| November 25, 2016 | 50,000 | $62.83 | $3,141,500.00 |
| November 28, 2016 | 119,111 | $62.84 | $7,484,935.24 |
| March 13, 2018 | 39,155 | $76.00 | $2,975,780.00 |

Thus, in total, before the fraud was exposed, he sold 208,266 Company shares on inside information, for which he received over $13.6 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

38.     The Company's 2020 Proxy Statement stated the following about Defendant Goldstein:

Mr. Goldstein's extensive experience in the hospitality and gaming industries, including as a senior executive officer of our Company (or its predecessors) since 1995, as well as his current position as our President and Chief Operating Officer, led the Board to conclude he would be a valuable member of our Board of Directors.

Mr. Goldstein has been the Company's President and Chief Operating Officer and a member of the Board of Directors since January 2015. He previously served as the Company's President of Global Gaming Operations from January 2011 until December 2014, the Company's Executive Vice President from July 2009 until December 2014, and the Company's Secretary from August 2016 to November 2016. He has held other senior executive positions at the Company and its subsidiaries since 1995. Mr. Goldstein has served as a member of the board of directors of our Company's subsidiary, Sands China Ltd., since May 2014, and as its interim president from January 2015 through October 2015. From 1992 until joining the Company in December 1995, Mr. Goldstein was the executive vice president of marketing at the Sands Hotel in Atlantic City, as well as an executive vice president of the parent Pratt Hotel Corporation. He served on the board of directors of Remark Media, Inc., a global digital media company, from May 2013 to March 2017.

39.     Upon information and belief, Defendant Goldstein is a resident of Nevada.

**Defendant Chafetz**

40.     Defendant Chafetz has served as a Company director since February 2005. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Chafetz beneficially owned 255,322,855 shares of the Company's common stock, which represented 33.4% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Chafetz owned over $10.3 billion worth of LVSC stock.

41.     For the fiscal year ended December 31, 2019, Defendant Chafetz received $233,682 in compensation from the Company. This included $129,795 in fees earned, $100,000 in stock awards, and $3,887 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Chafetz received $212,798 in compensation from the Company. This included $108,250 in fees earned, $100,000 in stock awards, and $4,548 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Chafetz received $215,915 in compensation from the Company. This included $109,750 in fees earned, $99,983 in stock awards, and $6,182 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Chafetz received $212,352 in compensation from the Company. This included $107,500 in fees earned, $99,998 in stock awards, and $4,854 in all other compensation.

42.     The Company's 2020 Proxy Statement stated the following about Defendant Chafetz:

Mr. Chafetz's extensive experience in the hospitality, trade show and convention businesses, as well as his experience as a former executive of our predecessor company, led the Board to conclude he would be a valuable member of our Board of Directors.

Mr. Chafetz has been a Director of the Company since February 2005. He was a director of Las Vegas Sands, Inc. from February until July 2005. Mr. Chafetz is a manager of The Interface Group, LLC, a Massachusetts limited liability company that controls Interface Group-Massachusetts, LLC. Mr. Chafetz has been associated with Interface Group-Massachusetts, LLC and its predecessors since 1972. From 1989 to 1995, Mr. Chafetz was a vice president and director of Interface Group-Nevada, Inc., which owned and operated trade shows, including COMDEX, and also owned and operated The Sands Expo and Convention Center. From 1989 to 1995, Mr. Chafetz was also vice president and a director of Las Vegas Sands, Inc. Mr. Chafetz has served on the boards of directors of many charitable and civic organizations and is a former member of the dean's advisory council at Boston University School of Management.

43.     Upon information and belief, Defendant Chafetz is a resident of Massachusetts.

**Defendant Chau**

44.     Defendant Chau has served as a Company director since October 2014. She also serves as a member of the Audit Committee and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Chau beneficially owned 14,583 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Chau owned over $589,007 worth of LVSC stock.

45.     For the fiscal year ended December 31, 2019, Defendant Chau received $257,682 in compensation from the Company. This included $129,795 in fees earned, $100,000 in stock awards, and $3,887 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Chau received $230,048 in compensation from the Company. This included $125,500 in fees earned, $100,000 in stock awards, and $4,548 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Chau received $234,915 in compensation from the Company. This included $128,750 in fees earned, $99,983 in stock awards, and $6,182 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Chau received $230,852 in compensation from the Company. This included $126,000 in fees earned, $99,998 in stock awards, and $4,854 in all other compensation.

46.     The Company's 2020 Proxy Statement stated the following about Defendant Chau:

Ms. Chau currently serves on the board of directors of Dolby Laboratories, Inc., and was a member of the board of directors of Red Hat, Inc. Ms. Chau's extensive and varied business experience, including as president and chief operating officer at Lucasfilm Ltd., and her experience as a director of other public companies led the Board to conclude she would be a valuable member of our Board of Directors.

Ms. Chau has been a Director of the Company since October 2014. She served as the president, chief operating officer and executive director of Lucasfilm Ltd., a film and entertainment company, from 2003 to 2012 and as its chief financial officer from 1991 to 2003. Before that, Ms. Chau held other executive-level positions in various industries, including retail, restaurant, venture capital and financial services. She currently serves on the board of directors of Dolby Laboratories, Inc., an audio, imaging and communications company, since February 2013, and was a member of the board of directors of Red Hat, Inc., a provider of open-source software solutions, from November 2008 to August 2012.

14

47.     Upon information and belief, Defendant Chau is a resident of California.

**Defendant Forman**

48.     Defendant Forman has served as a Company director since October 2014. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Forman beneficially owned 14,583 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Forman owned over $ $589,007 worth of LVSC stock.

49.     For the fiscal year ended December 31, 2019, Defendant Forman received $233,682 in compensation from the Company. This included $129,795 in fees earned, $100,000 in stock awards, and $3,887 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Forman received $212,792 in compensation from the Company. This included $108,250 in fees earned, $100,000 in stock awards, and $4,548 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Forman received $215,915 in compensation from the Company. This included $109,750 in fees earned, $99,983 in stock awards, and $6,182 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Forman received $212,352 in compensation from the Company. This included $107,500 in fees earned, $99,998 in stock awards, and $4,854 in all other compensation.

50.     The Company's 2020 Proxy Statement stated the following about Defendant Forman:

Mr. Forman's extensive experience in the hospitality, trade show and convention businesses led the Board to conclude he would be a valuable member of our Board of Directors.

Mr. Forman has been a Director of the Company since August 2004. He has been a director of Las Vegas Sands, LLC (or its predecessor, Las Vegas Sands, Inc.) since March 2004. In addition, he has served as a member of the board of directors of the Company's subsidiary, Sands China Ltd., since May 2014. Mr. Forman served as chairman and chief executive officer of Centric Events Group, LLC, a trade show and conference business from April 2002 until his retirement upon the sale of the business in 2007. From 2000 to 2002, he served as a director of a private company and participated in various private equity investments. During 2000, he was executive vice president of international operations of Key3Media, Inc. From 1998 to 2000, he was chief legal officer of ZD Events Inc., a

15

tradeshow business that included COMDEX. From 1995 to 1998, Mr. Forman was executive vice president, chief financial and legal officer of Softbank Comdex Inc. From 1989 to 1995, Mr. Forman was vice president and general counsel of Interface Group Nevada, Inc., a tradeshow and convention business that owned and operated COMDEX. Mr. Forman was in private law practice from 1972 to 1988. Mr. Forman is a member of the board of trustees of The Dana-Farber Cancer Institute and treasurer and a director of Nantucket Jewish Cemetery, Inc.

51.     Upon information and belief, Defendant Forman is a resident of Massachusetts.

**Defendant Gerard**

52.     Defendant Gerard served as a Company director from July 2014 until May 2019. He also served as the Chair of the Compensation Committee and as a member of the Audit Committee.

53.     For the fiscal year ended December 31, 2019, Defendant Gerard received $66,197 in compensation from the Company. This included $62,310 in fees earned and $3,887 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Gerard received $260,298 in compensation from the Company. This included $155,750 in fees earned, $100,000 in stock awards, and $4,548 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Gerard received $266,415 in compensation from the Company. This included $160,250 in fees earned, $99,983 in stock awards, and $6,182 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Gerard received $262,852 in compensation from the Company. This included $158,000 in fees earned, $99,998 in stock awards, and $4,854 in all other compensation.

54.     The Company's 2018 Proxy Statement (defined below) stated the following about Defendant Gerard:

Mr. Gerard has been a Director of the Company since July 2014. He served as the chief executive officer of CBIZ, Inc., a provider of integrated business services and products, from October 2000 until his retirement in March 2016, and continues to serve as the chairman of its board of directors, a position he has held since October 2002. Mr. Gerard was chairman and chief executive officer of Great Point Capital, Inc., a provider of operational and advisory services from 1997 to October 2000. From 1991 to 1997, he was chairman and chief executive officer of Triangle Wire & Cable, Inc. and its successor, Ocean View Capital, Inc. Mr. Gerard's prior experience includes 16 years with Citibank, N.A. in various senior corporate finance and banking positions. Further, Mr. Gerard served seven years with the American Stock Exchange, where he last served as vice president of

the securities division. Mr. Gerard also serves on the board of directors of Lennar Corporation, a home builder, and had served on the board of directors of Joy Global, Inc., a manufacturer and servicer of mining equipment. Mr. Gerard's extensive executive experience and service as a director of other public companies led the Board to conclude that he would be a valuable member of our Board of Directors.

55.     Upon information and belief, Defendant Gerard is a resident of New York.

**Defendant Jamieson**

56.     Defendant Jamieson has served as a Company director since June 2014. He also serves as the Chair of the Compliance Committee and as a member of the Audit Committee. Previously, he served as the Chair of the Audit Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Jamieson beneficially owned 14,087 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Jamieson owned nearly $568,974 worth of LVSC stock.

57.     For the fiscal year ended December 31, 2019, Defendant Jamieson received $268,800 in compensation from the Company. This included $164,913 in fees earned, $100,000 in stock awards, and $3,887 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Jamieson received $242,298 in compensation from the Company. This included $137,750 in fees earned, $100,000 in stock awards, and $4,548 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Jamieson received $248,415 in compensation from the Company. This included $142,250 in fees earned, $99,983 in stock awards, and $6,182 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Jamieson received $243,602 in compensation from the Company. This included $138,750 in fees earned, $99,998 in stock awards, and $4,854 in all other compensation.

58.     The Company's 2020 Proxy Statement stated the following about Defendant Jamieson:

Mr. Jamieson's extensive experience in the accounting profession, including his experience auditing public companies and his international experience, as well as his service on the boards of directors of charitable and civic organizations led the Board to conclude he would be a valuable member of our Board of Directors.

Mr. Jamieson has been a Director of the Company since June 2014. He is a certified public accountant and a retired partner of PricewaterhouseCoopers LLP. He served in various positions at PricewaterhouseCoopers LLP (or predecessor firms) in various capacities from 1964 until 1997 and most recently was managing director of accounting and auditing services for its Boston office. Mr. Jamieson is a member of the American Institute of Certified Public Accountants. He served as chairman of the finance committee and a member of the board of trustees of Colby-Sawyer College and retired as a member of the executive committee of the board of directors of the American Liver Foundation.

59.     Upon information and belief, Defendant Jamieson is a resident of New Hampshire.

**Defendant Koppelman**

60.     Defendant Koppelman has served as a Company director since October 2011. He also serves as the Chair of the Compensation Committee, as a member of the Nominating and Governance Committee, and as a member of the Compliance Committee. Previously, he served as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Koppelman beneficially owned 15,230 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Koppelman owned nearly $615,140 worth of LVSC stock.

61.     For the fiscal year ended December 31, 2019, Defendant Koppelman received $270,682 in compensation from the Company. This included $166,795 in fees earned, $100,000 in stock awards, and $3,887 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Koppelman received $249,798 in compensation from the Company. This included $145,250 in fees earned, $100,000 in stock awards, and $4,548 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Koppelman received $253,915 in compensation from the Company. This included $147,750 in fees earned, $99,983 in stock awards, and $6,182 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Koppelman received $249,852 in compensation from the Company. This included $145,000 in fees earned, $99,998 in stock awards, and $4,854 in all other compensation.

62.     The Company's 2020 Proxy Statement stated the following about Defendant Koppelman:

Mr. Koppelman served as executive chairman of Martha Stewart Living Omnimedia, Inc. and chairman of the board of Steve Madden Ltd. Mr. Koppelman's extensive executive experience as a chief executive officer, including in the entertainment industry, and his experience as a director of other public companies led the Board to conclude he would be a valuable member of our Board of Directors.

Mr. Koppelman has been a Director of the Company since October 2011. Mr. Koppelman currently serves as chairman and chief executive officer of CAK Entertainment, Inc., an entertainment consultant and brand development firm founded in 1997. Mr. Koppelman is also a former director of Steve Madden Ltd., and served as chairman of the board of that company from 2000 to 2004. From 2005 to 2011, Mr. Koppelman served as executive chairman and principal executive officer of Martha Stewart Living Omnimedia, Inc. and served as a director of the company from 2004 to 2011. From 1990 to 1994, he served first as chairman and chief executive officer of EMI Music Publishing and then from 1994 to 1997 as chairman and chief executive officer of EMI Records Group, North America. He served as a director of Six Flags Entertainment Corp. from May 2010 to November 2016.

63.     Upon information and belief, Defendant Koppelman is a resident of New York.

**Defendant Kramer**

64.     Defendant Kramer has served as a Company director since April 2017. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. Previously, he served as a member of the Audit Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Kramer beneficially owned 10,801 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Kramer owned nearly $436,252 worth of LVSC stock.

65.     For the fiscal year ended December 31, 2019, Defendant Kramer received $268,918 in compensation from the Company. This included $165,031 in fees earned, $100,000 in stock awards, and $3,887 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Kramer received $241,798 in compensation from the Company. This included $137,250 in fees earned, $100,000 in stock awards, and $4,548 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Kramer received $303,579 in compensation from the Company. This included $103,602 in fees earned, $99,983 in stock awards, and $99,994 in option awards.

66.     The Company's 2020 Proxy Statement stated the following about Defendant Kramer:

Mr. Kramer has served on the board of directors of L3 Technologies, Inc. (and predecessor companies). Mr. Kramer's extensive financial and business knowledge gained while serving as an independent auditor for organizations across diverse industries and his experience as a director of a public company and non-profit organizations led the Board to conclude he would be a valuable member of our Board of Directors.

Mr. Kramer has been a Director of the Company since April 2017. Mr. Kramer was a partner at Ernst & Young LLP from 1981 until he retired in June 2009 after a nearly 40-year career at Ernst & Young LLP. At the time of his retirement, Mr. Kramer served as the global client service partner for worldwide external audit and all other services for major clients, and served on the firm's United States executive board. He previously served as Ernst & Young LLP's national director of audit services. Mr. Kramer has served on the board of directors of L3 Technologies, Inc., (and predecessor companies), since 2009.

67.     Upon information and belief, Defendant Kramer is a resident of Florida.

**Defendant Levi**

68.     Defendant Levi has served as a Company director since January 2015. He also serves as the Chair of the Nominating and Governance Committee, as a member of the Compensation Committee, and as a member of the Compliance Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Levi beneficially owned 16,465 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $40.39, Defendant Levi owned nearly $665,021 worth of LVSC stock.

69.     For the fiscal year ended December 31, 2019, Defendant Levi received $266,800 in compensation from the Company. This included $162,913 in fees earned, $100,000 in stock awards, and $3,887 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Levi received $240,798 in compensation from the Company. This included $136,250 in fees earned, $100,000 in stock awards, and $4,548 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Levi received $244,915 in compensation from the Company. This included $138,750 in fees earned, $99,983 in stock awards, and $6,182 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Levi received $240,352 in compensation from the Company. This included $135,500 in fees earned, $99,998 in stock awards, and $4,854 in all other compensation.

70.     The Company's 2020 Proxy Statement stated the following about Defendant Levi:

Mr. Levi's extensive legal, judicial, academic and administrative experience, including as a Federal judge and the dean of a major law school, led the Board to conclude he would be a valuable member of our Board of Directors.

Mr. Levi has been a Director of the Company since January 2015. Mr. Levi is the Levi Family Professor of Law and Judicial Studies and Director of the Bolch Judicial Institute of Duke University School of Law. He was previously Dean of the Duke University School of Law from 2007 to 2018. He served as the chief United States district judge for the Eastern District of California from May 2003 until June 2007. He took the oath of office as a United States district judge in November 1990. He also served as the presidentially appointed United States attorney for the Eastern District of California from 1986 until November 1990. He was a member of the Attorney General's advisory committee of U.S. attorneys and served as chair of the public corruption sub-committee. Prior to his appointment as United States attorney, he served as an assistant United States attorney for the Eastern District of California. In 2004, he was elected to the Council of the American Law Institute and is currently the president of that organization. He is an elected fellow of the American Academy of Arts and Sciences and a member of the board of the National Parks Conservation Association. He served as chair of two judicial conference committees by appointment of the chief justice. He was named chair of the civil rules advisory committee in 2000 and chair of the standing committee on the Rules of Practice and Procedure in 2003, where he served in that capacity until 2007.

71.     Upon information and belief, Defendant Levi is a resident of North Carolina.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

72.     By reason of their positions as officers, directors, controlling shareholder, and/or fiduciaries of LVSC and because of their ability to control the business and corporate affairs of LVSC, the Individual Defendants owed LVSC and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LVSC in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LVSC and its shareholders so as to benefit all shareholders equally.

73.     Each controlling shareholder, director, and officer of the Company owes to LVSC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

74. The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controlling shareholders of LVSC, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

75. To discharge their duties, the officers, directors, and controlling shareholders of LVSC were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

76. Each Individual Defendant, by virtue of his, her, or its position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controlling shareholders of LVSC, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised LVSC's Board at all relevant times.

77. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all

those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

78. To discharge their duties, the officers and directors of LVSC were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of LVSC were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, Singapore, and the United States, and pursuant to LVSC's own Code of Ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how LVSC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of LVSC and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that LVSC's operations would comply with all applicable laws and LVSC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

79.     Each of the Individual Defendants further owed to LVSC and the shareholders the duty of loyalty requiring that each favor LVSC's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

80.     At all times relevant hereto, the Individual Defendants were the agents of each other and of LVSC and were at all times acting within the course and scope of such agency.

81.     Because of their advisory, executive, managerial, and directorial positions with LVSC, each of the Individual Defendants had access to adverse, non-public information about the Company.

82.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by LVSC.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

83.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to

conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

84. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price while the Company repurchased its own stock.

85. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of LVSC was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

86. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

87.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LVSC, and was at all times acting within the course and scope of such agency.

## LVSC'S CODE OF ETHICS & GOVERNENACE

### Code of Ethics

88.     LVSC's Code of Ethics states that it "applies to all directors, officers – including our principal executive officer, principal financial officer, and principal accounting officer – Team Members, consultants, vendors, and agents of the Company, regardless of where they perform their work for the Company."

89.     In a section titled, "Doing Business the Right Way," the Code of Ethics states the following, in relevant part:

> **We do business ethically and legally**
> We follow the letter and the spirit of all laws the Company is obligated to follow. We are aware of our global obligations. We act with integrity in every action we take on behalf of the Company.
>
> **We protect our Company and our investors**
> The continued growth of the Company benefits our investors and our Team Members. Our actions are designed to safeguard the assets and reputation of the Company.

(Emphasis in original.)

90.     In a section titled, "We Follow the Code," the Code of Ethics states the following:

> As a public company and business operating under licenses obtained in the various jurisdictions in which we operate, we must be mindful of the many important laws and regulations governing our conduct. Compliance with both the letter and spirit of all laws, rules, and regulations applying to the Company's business, including the requirements of any organization or entity regulating the Company, is critical to the Company's reputation and continued success. You must respect and obey the laws of the cities, states, and countries in which we operate and avoid even the appearance of impropriety.

91.     In a section titled, "Your Responsibilities as a Team Member," the Code of Ethics states the following:

Report violations or concerns. If you discover what you in good faith believe are actions in violation of this Code, or are actions of a questionable, fraudulent, or illegal nature, you must report the matter immediately in accordance with the Company's **Reporting and Non-Retaliation Policy**. Making a report in good faith does not mean your suspicions have to be correct or proven. It just requires that you provide truthful and accurate information if you have a reasonable basis to believe the reportable behavior occurred or is going to occur.

(Emphasis in original.)

92.     In a section titled, "Special Responsibilities for Leaders and Managers," the Code of Ethics states the following:

Making sure we comply with the Code is the responsibility of every Team Member, but managers, supervisors, and our Company leaders have a special responsibility for ensuring the Code and Company policies are followed. Every manager and supervisor is responsible for communicating Company policies to his or her Team Members, including those dealing with legal and ethical behavior. Managers and supervisors are also responsible for maintaining a work environment where constructive, candid, and open discussion is encouraged and expected, without fear of retaliation. But most importantly, managers, supervisors, and Company leaders should be role models for their teams.

93.     In a section titled, "Complying with Gaming Laws and Regulations," the Code of Ethics states the following:

**Doing the Right Thing**
We comply with gaming laws and regulations in every jurisdiction in which we conduct business.

**WHY We Do It**
Gaming is a highly regulated business. All of our properties operate pursuant to specially granted licenses and/or concessions. Accordingly, we must be cognizant of the laws, rules, and regulations governing our gaming activities. We also have a responsibility to ensure our gaming activity is fair to our patrons.

**HOW We Do It**
• Complying with all rules and regulations set forth by gaming regulators in the regions in which we operate.
• Maintaining a successful compliance program focusing on gaming regulatory matters.
• Creating gaming-related policies, procedures, and internal controls, and publicizing them where appropriate.
• Cooperating with regulators in the jurisdictions in which we operate.
• Training Team Members on casino-related operations and the rules applying to them.

(Emphasis in original.)

94.     In a section titled, "Preventing Money Laundering," the Code of Ethics provides the following:

**Doing the Right Thing**
We prevent money laundering and terrorist financing activities by complying with all laws and regulations and enforcing a strict AntiMoney Laundering ("AML") Program.

**WHY We Do It**
Money laundering has significant economic, security, and social consequences. Money laundering takes several forms, including (1) hiding the proceeds of illegal activities, (2) making the sources of illegal funds appear legitimate, or (3) spending "dirty money," such as by gambling or shopping. It also includes terrorist financing, the process by which illegal terrorist organizations channel funds to their operations. A variety of criminal enterprises, including those dealing dangerous drugs or engaging in human trafficking, rely on money laundering to process their illegal profits. At Las Vegas Sands, our casinos assist our governments in combating money laundering and terrorist financing. We focus on preventing, detecting, and reporting suspicious activities and transactions that may take place on our properties.

**HOW We Do It**
• Adopting a Global AML policy.
• Ensuring that each property strictly adheres to all applicable AML and Counter Financing of Terrorism laws and regulations.
• Ensuring each property is following a strict program of internal controls to prevent money laundering.
• Providing AML training tailored to appropriate Team Members' duties and responsibilities.
• Promoting and maintaining an open line of communication between departments.
• Knowing our guests and understanding their sources of funds.
• Filing all required reports and partnering with local law enforcement and government agencies.
• Recognizing indicators ("red flags") of suspicious activities and transactions in a casino.
• Stopping the play of any guest we believe is involved in money laundering activity.

**WHAT Does Money Laundering Look Like?**
Every case is unique, but one example would be a guest who arrives at a gaming table with large amounts of small bills derived from drug dealing. The guest converts the cash into chips, plays for only a few minutes, and bets only a very small portion of their stack. The guest then heads to the cage where they ask for their money in larger denominations. They are paid and leave the premises. The guest can now claim the cash as "winnings" and although they may have to pay taxes on it, they can show it as "legitimate" income.

**WHAT Are the Red Flags?**
Indicators of potentially suspicious activities and transactions you may encounter. Here are a few examples:
• A guest's reluctance to proceed with a transaction after being told it must be reported to the government.

• A guest refusing to provide identification or identifying information.
• Large transactions with minimal gaming activity.
• A guest providing insufficient or suspicious information, such as conflicting identification.
• A guest chip sharing with other guests without justification or allowing other guests to play under their membership card.

**Learn More**
• Global AML Policy
• Internal Controls:
– Marina Bay Sands
– Sands China Limited
– Venetian Casino Resorts

**Key Definitions**
• Currency Transaction Report ("CTR"/"LSTR"): A CTR (called an LSTR in Macao) is a report we must file with the government when a person or their agent conducts a single or multiple currency transactions in excess of a designated amount in a day.
• Suspicious Activity or Transactions Report ("SAR"/"STR"): An SAR (in the U.S.) or STR (in other jurisdictions) is a report we must file with the government concerning suspicious or potentially suspicious activities and transactions that take place at or involve our properties.
• Chip Walk: A patron may have "walked with chips" when they appear to have left the casino without redeeming the chips in their possession and did not return within a reasonable time frame.
• Structuring: The act of breaking down large transactions into smaller transactions in an attempt to avoid the filing of a CTR.

(Emphasis in original.)

95.     In a section titled, "Protecting Company Resources," the Code of Ethics states the following:

**Doing the Right Thing**
We protect Company resources by using them only for legitimate business purposes.

**WHY We Do It**
The Company knows you need the right tools to do your job the right way. In some cases, those tools may literally be a hammer or a screwdriver; in other cases, it could be a computer, a copier, or the linens we use in guest suites. Our job is to use those resources honestly and efficiently for legitimate business purposes. If our resources are wasted or unavailable, our business will be disrupted.

**HOW We Do It**
• Requiring Team Members to sign and abide by the Team Member Handbook.
• Not using Company resources for personal purposes.
• Immediately reporting the loss or theft of Company property.

• Receiving Compliance Department approval for use of a Company asset for political purposes.

(Emphasis in original.)

96.     In a section titled, "Maintaining Accurate Books and Records," the Code of Ethics states the following:

**Doing the Right Thing**
We implement an effective system of internal controls to ensure our internal books and records are accurate and complete.

**WHY We Do It**
The trust of the public, regulators, and our investors is paramount. If we lose that trust, we undermine the Company's ability to operate. Part of maintaining that trust is making sure we have a thorough and complete system of internal controls. There can be no question about the accuracy of Company books and records or the integrity of the processes the Company employs. Our records must fully and accurately reflect what actually happens each and every time we engage in a business transaction. In addition, the laws under which the Company operates have very specific requirements with regard to our books and records.

**HOW We Do It**
As a company, we follow three key principles:
• Maintain, and require all Team Members to comply with, our internal controls.
• Ensure that our internal books and records are prepared with the highest standard of care and accurately reflect our financial transactions.
• Provide reports and documents to the public and our regulators that are complete, accurate, timely, and understandable.

In addition, each individual Team Member is responsible for making sure:
• All transactions are transparent and accurate. Do not establish, for any purpose, an unauthorized, undisclosed, or unrecorded fund or asset. Do not make any attempt to hide or disguise the true nature or cost of any transaction. Do not falsify, omit, alter, or conceal any facts in Company business records.
• Any spending of Company funds must be within your authority under the Approval and Authorization Guidelines and Approval and Authorization Policy.
• Transactions with customers and third parties are structured or recorded in a manner consistent with the Company's policies and procedures for engaging, contracting, and paying third parties.
• All third parties undergo our screening and due diligence process, and contracts with them are tracked, typically via Ariba, the automated system that helps us manage our relationships.

* * *

**Key Information**

When the Code refers to "books and records" or "business records," it is not limited to the formal accounting ledgers kept by the Company. It includes any document, whether hard copy or electronic, that is created or used in the course of accounting for the Company's operations. This includes emails, spreadsheets, presentations, memos, invoices, purchase orders, and expense reports, as just a few examples. All of these records must be accurate and truthful. You are accountable for the accuracy of the records you create or maintain.

(Emphasis in original.)

97.     In a section titled, "Avoiding Conflicts of Interest," the Code of Ethics stated the following

in relevant part:

**Doing the Right Thing**
We work diligently to identify and prevent situations in which Covered Persons' interests conflict or appear to conflict with the best interests of the Company.

**WHY We Do It**

Our investors and fellow Team Members expect that in everything we do at work we act in the best interests of Las Vegas Sands. We bring fair and unbiased independent judgment to our work so we can maximize shareholder value and help grow the Company. A conflict of interest exists where a Covered Person has a personal or private interest that does, could, or appears to interfere with the Covered Person's ability to do a job fairly and ethically, or that compromises his or her position of trust with the Company.

**HOW We Do It**
• Following the detailed Conflict of Interest Policy that requires us to disclose and resolve all conflicts.
• Avoiding any personal or private interest that does, could, or appears to influence our independent judgment or conflicts with the Company's interests.
• Providing written notice to the Company of any actual, perceived, or potential conflicts of interests, as soon as the Covered Person becomes aware of the situation by:
– Completing the Disclosure Form attached to the Conflict of Interest Policy, or
– Using the reporting tool in ServiceNow (our electronic portal).
• Prioritizing advancement of the Company's legitimate business interests.

(Emphasis in original.)

98.     In a section titled, "Complying with Securities Trading Laws," the Code of Ethics stated

the following in relevant part:

**Doing the Right Thing**
We comply with all securities trading laws and do not allow our Team Members to use inside information to trade in the markets.

**WHY We Do It**

Securities laws aim to ensure the buying and selling of publicly traded securities – such as our Company's stock – is done fairly. Everyone buying or selling stock should have access to the same information. Maintaining the confidence of the investing public is crucial to maintaining shareholder value. Trading on inside information and tipping are both unethical and illegal; violations carry serious penalties. In addition to strict legal compliance, we strive to avoid even the appearance of impropriety and to protect the Company's reputation for honesty and integrity.

**HOW We Do It**
As a Company we:
• Promulgate the Securities Trading Policy and the Confidential Information Policy.
• Require that new hires receive and acknowledge the Securities Trading Policy.
• Provide annual training for all Team Members on the Securities Trading Policy.

Covered Persons and their Immediate Family Members are prohibited from:
• Trading in Company stock while in possession of Material Non-Public ("Inside") Information.
• Tipping.
• Trading Company stock outside the Company's trading window if they are on the Company's restricted trading list and are required to pre-clear any transaction.

(Emphasis in original.)

99.    In a section titled, "Making Sure the Code Works," the Code of Ethics stated the following in relevant part:

The Board of Directors' Compliance Committee provides oversight of the Company's compliance program with respect to (a) compliance with the laws and regulations applicable to the Company's business, including gaming laws; and (b) compliance with the Code, its AntiCorruption Policy, its Anti-Money Laundering Policy, and its Reporting and Non-Retaliation Policy.

The Board of Directors' Audit Committee provides oversight of the Company's internal controls and financial matters.

* * *

**Disciplinary Action**
The Code is very important to the Company. Failure to comply with the standards outlined herein and all policies referred to herein will result in disciplinary action, up to and including termination, where permitted by law. Some violations of the Code or other Company policy are serious enough to warrant dismissal in the first instance.

Disciplinary action will be taken against:
• Any Team Member who violates the Code or pertinent law.
• Any Team Member who deliberately withholds relevant information concerning a violation of the Code or pertinent law.

• The Team Member's manager or supervisor to the extent that the circumstances of the violation reflect participation in the violation, or lack of diligence.
• Any Team Member who retaliates, directly or indirectly, or encourages others to do so, against a Team Member who reports a Code, policy, or law violation.
• Any Team Member who knowingly falsely accuses another Team Member of a Code, policy, or law violation.

In addition, the Board of Directors of the Company has adopted a **Clawback Policy** which requires a Team Member to return a bonus to the Company where the bonus was achieved as a result of the Team Member's misconduct.

* * *

Team Member may be subject to disciplinary action, including termination of employment, if the Team Member fails to cooperate in an investigation, deliberately provides false or misleading (including diverting, misdirecting, or offering incomplete) information during an investigation, or deliberately conceals or destroys records or anything in order to hinder the investigation.

* * *

You must never under any circumstance:
• Destroy or alter any Company document or record, including emails and other electronic records, in anticipation of a request for the document or record by a governmental agency or court.

* * *

• Attempt to persuade any Covered Person, or any other person, to provide false or misleading information to a governmental investigator, to destroy or alter any document or record, or to fail to fully and truthfully cooperate with a governmental inquiry.

(Emphasis in original.)

**Compliance Committee Charter**

100.   LVSC's Compliance Committee Charter states that the Compliance Committee's purpose is to "assist the Board in overseeing the Company's compliance program with respect to (i) compliance with the laws and regulations applicable to the Company's business, including gaming laws; and (ii) compliance with the Company's Code of Business Conduct and Ethics, its Anti-Corruption Policy, its Anti-Money Laundering Policy, Anti-Human Trafficking Policy, and its Reporting and Non-Retaliation

Policy (collectively, the "Policies") applicable to the Company's directors, officers, team members, contractors and agents."

101.    In a section titled, "Authority and Responsibilities," the Compliance Committee Charter further provides that:

To fulfill its responsibilities, the Committee shall:

1. Provide oversight as needed to ensure that the Company's compliance program effectively prevents and/or detects violations by the Company's directors, officers, team members, contractors and agents of applicable laws, rules, regulations, the Policies, and any special conditions imposed on the Company by any governmental or regulatory authority.

2. Oversee the compliance review process to ensure that the vendors (including consultants) and customers with which the Company does business are, as applicable, entities/individuals: (i) that will cooperate with appropriate regulatory authorities; (ii) that are "suitable" or "qualified" as those terms are used by applicable gaming and other authorities; and (iii) whose role with the Company is not likely to result, in the judgment of the Committee, in the Company's failure to obtain, maintain, renew or qualify for a license, concession, contract, franchise or other governmental or regulatory approval with respect to the operation or conduct of the Company's business.

3. Review resources assigned to the Company's compliance program to assess their adequacy relative to the program's effectiveness.

4. Meet separately, on a quarterly basis, with the Company's Global Chief Compliance Officer and receive reports of relevant conduct, misconduct, and such other issues as the Global Chief Compliance Officer and the Committee deem appropriate. The Global Chief Compliance Officer shall report to the Committee potential criminal acts and serious violations of the Policies committed by the Company's directors, officers, team members, contractors, and agents, including vendors and customers, and all disciplinary actions and remedial measures involving compliance infractions as soon as practicable after the Global Chief Compliance Officer becomes aware of them and no later than the next scheduled meeting of the Committee.

\* \* \*

6. Receive summary reports from management on internal messaging to team members regarding the Company's commitment to behavior and practices that comply with law, as well as the Company's efforts to promote a culture of compliance.

7. Receive summary reports from management or the Global Chief Compliance Officer that directors, officers, employees in high-risk and control functions, and, where

appropriate, agents and business partners, have completed periodic compliance training and confirmed compliance with Company policies and procedures.

8. Review and discuss on a quarterly basis with the Global Chief Compliance Officer reports made to the Company's confidential hotline and investigations conducted by the Compliance Department.

9. Review and discuss with the Global Chief Compliance Officer the quarterly reports of the Company's internal Operational Compliance Committee meetings.

10. Review periodic reports on compliance-related internal investigations and matters on which the Company has sought advice from external legal counsel or professional consultants in the areas of anti-corruption, anti-money laundering and other compliance matters and review briefings from the Company regarding recent legal or regulatory changes in these areas.

11. Review with the Global Chief Compliance Officer any correspondence with regulatory or government agencies that raise material issues regarding the Company's compliance program.

12. Review and assess the adequacy of the Policies at least annually and recommend to the Board any changes deemed appropriate by the Committee.

13. Review, based upon the recommendation of the Global Chief Compliance Officer, the scope and plan of the work to be done by the compliance group and the responsibilities, budget and staffing needs of the compliance group.

14. Review on an annual basis the performance of the compliance group and the Global Chief Compliance Officer.

15. Review and assess the adequacy of this Charter annually and recommend to the Board any changes deemed appropriate by the Committee.

16. Review its own performance annually.

17. Perform any other activities consistent with this Charter, the Company's bylaws and governing law, as the Committee or the Board deems appropriate.

**Reporting and Non-Retaliation Policy**

102. LVSC's Reporting and Non-Retaliation Policy (the "Reporting Policy") states that "[a]ll Team Members and Covered Persons are required to report any Mandatory Reportable Conduct ("MRC") known to them using one of the methods detailed below." The Reporting Policy states the following:

What conduct is considered MRC?

Violation of any government law, rule, or regulation to which the Company is subject:

* * *

• Anti-Money Laundering laws or regulations
• Insider trading laws
• Violations of Gaming Regulations[.]

103.    In violation of the Code of Ethics and the Company's governance policies, the Individual Defendants conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which the Individual Defendants engaged in and/or permitted despite being aware of it) or the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act. Moreover, at least one of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

104.    LVSC is a Fortune 500 company and purports to be the leading global developer of destination properties that feature premium accommodations, world-class gaming, entertainment and retail malls, convention and exhibit facilities, celebrity chef restaurants and other amenities. The Company caters to high-end game players, or gamblers, by supposedly providing them with luxury amenities and premium service levels. The Company owns and operates such integrated resorts located in Las Vegas, Nevada; Macao, China; and Singapore. In Singapore, LVSC owns and operates

the Marina Bay Sands, which has become one of Singapore's major tourist, business and retail destinations since its opening in 2010.

105.    LVSC was incorporated in Nevada in August 2004, when the Company went public. Prior to its initial public offering, the Company operated as Las Vegas Sands, Inc. which formed in 1988, and survives today as LVSC's wholly-owned operating subsidiary.

106.    Two years later, on August 23, 2006, LVSC entered into the Development Agreement with the Singapore Tourism Board to design, develop, construct and operate the Marina Bay Sands, an integrated resort including a casino, hotel, retail complex, a convention center and meeting room complex, theaters, restaurants, and an art/science museum.

107.    As a company that operates in the casino business, LVSC is bound by the Development Agreement and required, pursuant to the Casino Control Act, to maintain casino control measures. Such controls include, among other things, controls over branch office operations, casino operations including casino-related financial transactions and patron disputes, issuance of credit and collection of debt, relationships with and permitted payments to gaming promoters, security and surveillance, compliance functions and the prevention of money laundering, periodic standard and other reports to the CRA, and those relating to social controls.

108.    Throughout the Relevant Period, the Individual Defendants caused the Company to file annual and periodic reports with the SEC that asserted that the Company had effective disclosure controls and internal controls over financial reporting, and that there were no changes in the effectiveness of the Company's controls from quarter to quarter.

109.    However, the Company in fact failed to maintain effective casino control measures or internal controls during the Relevant Period. These control failures would ultimately lead to, *inter alia*, the Xi Lawsuit in which Xi alleged that LVSC fraudulently transferred millions of dollars of his money to third-parties without his consent.

110.    As described herein, the Xi Lawsuit gave rise to investigations into the Company's controls including regarding LVSC's transfer of funds and its procedures for preventing money laundering. However, this is not LVSC's first run-in with deficient casino control measures and a resultant investigation in connection to the casino's potential participation in a money laundering scheme. In fact, after an investigation by the DOJ, in 2013, LVSC agreed to pay more than $47.4 million to the U.S. government to avoid charges over its failure to report suspicious transactions by an alleged drug kingpin in violation of the Bank Secrecy Act.

111.    Although the Company was supposed to strengthen its casino control measures in accordance with its 2013 non-prosecution agreement with the DOJ, according to the investigation by Hogan Lovells in 2019, the Fraudulent Money Transfer Scheme had been transpiring since at least 2013. Moreover, while the Company failed to disclose the Fraudulent Money Transfer Scheme to the investing public, as described below, the Individual Defendants were clearly aware of the Fraudulent Money Transfer Scheme and the Company's weaknesses in casino control measures, disclosure controls, and internal controls as LVSC had told the CRA that it had "strengthened its control process" in April 2018 to ensure that gamblers authorize each fund transfer and had additionally hired Hogan Lovells to perform an investigation into the Fraudulent Money Transfer Scheme, thereby acting with requisite intent, as alleged herein.

**Fraudulent Money Transfer Scheme**

112.    During the Relevant Period, the Individual Defendants permitted and/or maintained, and caused the Company to engage in the Fraudulent Money Transfer Scheme. The Individual Defendants allowed multiple violations of LVSC's corporate governance policies to occur that injured the Company. These violations included, but were not limited to, engaging in and/or permitting the Fraudulent Money Transfer Scheme and engaging in or allowing widespread violations of the Company's Code of Conduct and governance policies as alleged herein. The Fraudulent Money Transfer Scheme resulted in, among

other things, a slew of internal and outside investigations conducted by, among others, Hogan Lovells, Davinder Singh Chambers LLC, Singapore's police force, the CRA, the DOJ, litigation against the Company in connection to the Fraudulent Money Transfer Scheme, news articles reporting on the Fraudulent Money Transfer Scheme, the Company entering into settlement worth millions of dollars in connection to the Xi Lawsuit, and, consequently, a decline in the value of the Company.

### False and Misleading Statements

#### February 26, 2016 Form 10-K

113.    On February 26, 2016, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2015 with the SEC (the "2015 10-K"). The 2015 10-K was signed by Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Gerard, Jamieson, Koppelman, and Levi, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

114.    In its discussion regarding the Company's Development Agreement with the Singapore Tourism Board, the 2015 10-K stated that Marina Bay Sands "***must comply with comprehensive internal control standards or regulations concerning*** advertising; ***branch office operations***; the location, floor plans and layout of the casino; ***casino operations including casino related financial transactions and patron disputes***, ***issuance of credit and collection of debt***, ***relationships with and permitted payments to junket operators; security and surveillance***; casino access by Singaporeans and non-Singaporeans; ***compliance functions and the prevention of money laundering***; ***periodic standard and other reports to the CRA; and those relating to social controls*** including the exclusion of certain persons from the casino." (Emphasis added.)

115.    Regarding certain risk factors related to the operation of the Company's business in Singapore, the 2015 10-K provided general, broad, and boilerplate language rather than narrowly tailored disclosures in connection to identifiable threats to the Company's business operations such as already realized weaknesses in its casino control measures as well as the Fraudulent Money Transfer Scheme. The 2015 10-K stated that "[c]onducting business in … Singapore has certain political and economic risks, which may have a material adverse effect on our business, financial condition, results of operations and cash flows." Specifically, the 2015 10-K stated the following, in relevant part:

> Current … Singapore laws and regulations concerning gaming and gaming concessions and licenses are, for the most part, fairly recent and there is little precedent on the interpretation of these laws and regulations. ***We believe that our organizational structure and operations are in compliance in all material respects with all applicable laws and regulations of … Singapore***. These laws and regulations are complex and a court or an administrative or regulatory body may in the future render an interpretation of these laws and regulations, or issue regulations, which differs from our interpretation and could have a material adverse effect on our financial condition, results of operations and cash flows.
>
> In addition, our activities in … Singapore are subject to administrative review and approval by various government agencies.

(Emphasis added.)

116.    With respect to the Company's controls and procedures, the 2015 10-K stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Principal Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of December 31, 2015, and have concluded that they are effective at the reasonable assurance level***.
>
> It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of

control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

\* \* \*

There were no changes in the Company's internal control over financial reporting that occurred during the fourth quarter covered by this Annual Report on Form 10-K that had a material effect, or was reasonably likely to have a material effect, on the Company's internal control over financial reporting.

\* \* \*

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2015. In making this assessment, the Company's management used the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)."

***Based on this assessment, management concluded that, as of December 31, 2015, the Company's internal control over financial reporting is effective based on this framework.***

(Emphasis added.)

***May 6, 2016 Form 10-Q***

117.    On May 6, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2016 (the "1Q16 10-Q"). The 1Q16 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

118.    Regarding risk factors, the 1Q16 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2015."

119.    With respect to the Company's internal controls, the 1Q16 10-Q stated the following, in relevant part:

*Based on the information provided to management by the Audit Committee and its counsel, the Company believes, and the Audit Committee concurs, that the preliminary findings: … do not represent a material weakness in the Company's internal controls over financial reporting as of March 31, 2016.*

\* \* \*

Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. *The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of March 31, 2016, and have concluded that they are effective at the reasonable assurance level.*

It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

\* \* \*

*There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had, or was reasonably likely to have, a material effect on the Company's internal control over financial reporting.*

(Emphasis added.)

### August 5, 2016 Form 10-Q

120.    On August 5, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2016 (the "2Q16 10-Q"). The 2Q16 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

121.     Regarding risk factors, the 2Q16 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2015."

122.     With respect to the Company's internal controls, the 2Q16 10-Q stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of June 30, 2016, and have concluded that they are effective at the reasonable assurance level.***

> It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

> * * *

> ***There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had, or was reasonably likely to have, a material effect on the Company's internal control over financial reporting.***

(Emphasis added.)

### *November 4, 2016 Form 10-Q*

123.     On November 4, 2016, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2016 (the "3Q16 10-Q"). The 3Q16 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any

material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

124.    Regarding risk factors, the 3Q16 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2015."

125.    With respect to the Company's internal controls, the 3Q16 10-Q stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of September 30, 2016, and have concluded that they are effective at the reasonable assurance level.***

> It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

> *    *    *

> ***The only change in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had, or was reasonably likely to have, a material effect on the Company's internal control over financial reporting was the opening of The Parisian Macao in September 2016. The Company has implemented controls and procedures at The Parisian Macao similar to those in effect at the Company's other properties.***

(Emphasis added.)

*February 24, 2017 Form 10-K*

126.     On February 24, 2017, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 with the SEC (the "2016 10-K"). The 2016 10-K was signed by Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Gerard, Jamieson, Koppelman, and Levi, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

127.     Like the 2015 10-K, in its discussion regarding the Company's Development Agreement with the Singapore Tourism Board, the 2016 10-K stated that Marina Bay Sands "***must comply with comprehensive internal control standards or regulations concerning*** advertising; ***branch office operations***; the location, floor plans and layout of the casino; ***casino operations including casino related financial transactions and patron disputes, issuance of credit and collection of debt, relationships with and permitted payments to junket operators; security and surveillance***; casino access by Singaporeans and non-Singaporeans; ***compliance functions and the prevention of money laundering; periodic standard and other reports to the CRA; and those relating to social controls*** including the exclusion of certain persons from the casino." (Emphasis added.)

128.     Regarding certain risk factors related to the operation of the Company's business in Singapore, the 2016 10-K again provided general, broad, and boilerplate language rather than narrowly tailored disclosures in connection to identifiable threats to the Company's business operations such as already realized weaknesses in its casino control measures as well as the Fraudulent Money Transfer Scheme. The 2016 10-K stated that "[c]onducting business in … Singapore has certain political and economic risks, which may have a material adverse effect on our business, financial condition, results of operations and cash flows." Specifically, the 2016 10-K stated the following, in relevant part:

Current … Singapore laws and regulations concerning gaming and gaming concessions and licenses are, for the most part, fairly recent and there is little precedent on the interpretation of these laws and regulations. ***We believe that our organizational structure and operations are in compliance in all material respects with all applicable laws and regulations of … Singapore***. These laws and regulations are complex and a court or an administrative or regulatory body may in the future render an interpretation of these laws and regulations, or issue regulations, which differs from our interpretation and could have a material adverse effect on our financial condition, results of operations and cash flows.

In addition, our activities in … Singapore are subject to administrative review and approval by various government agencies.

(Emphasis added.)

129. With respect to the Company's controls and procedures, the 2016 10-K stated the following, in relevant part:

Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of December 31, 2016, and have concluded that they are effective at the reasonable assurance level***.

It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

* * *

There were no changes in the Company's internal control over financial reporting that occurred during the fourth quarter covered by this Annual Report on Form 10-K that had a material effect, or was reasonably likely to have a material effect, on the Company's internal control over financial reporting.

* * *

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2016. In making this assessment, the Company's management used the framework set forth by the Committee of Sponsoring

Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)."

***Based on this assessment, management concluded that, as of December 31, 2016, the Company's internal control over financial reporting is effective based on this framework.***

(Emphasis added.)

### May 5, 2017 Form 10-Q

130.     On May 5, 2017, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2017 (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

131.     Regarding risk factors, the 1Q17 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2016."

132.     With respect to the Company's internal controls, the 1Q17 10-Q stated the following, in relevant part:

Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of March 31, 2017, and have concluded that they are effective at the reasonable assurance level.***

It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions

about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

* * *

***There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had, or was reasonably likely to have, a material effect on the Company's internal control over financial reporting.***

(Emphasis added.)

***August 4, 2017 Form 10-Q***

133.     On August 4, 2017, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2017 (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

134.     Regarding risk factors, the 2Q17 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2016."

135.     With respect to the Company's internal controls, the 2Q17 10-Q stated the following, in relevant part:

Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of June 30, 2017, and have concluded that they are effective at the reasonable assurance level.***

It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

* * *

**There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had, or was reasonably likely to have, a material effect on the Company's internal control over financial reporting.**

(Emphasis added.)

**November 3, 2017 Form 10-Q**

136. On November 3, 2017, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

137. Regarding risk factors, the 3Q17 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2016."

138. With respect to the Company's internal controls, the 3Q17 10-Q stated the following, in relevant part:

Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. **The Company's Chief Executive Officer**

*and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of September 30, 2017, and have concluded that they are effective at the reasonable assurance level.*

It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

\* \* \*

*There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had, or was reasonably likely to have, a material effect on the Company's internal control over financial reporting.*

(Emphasis added.)

### February 23, 2018 Form 10-K

139.    On February 23, 2018, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2017 with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Gerard, Jamieson, Koppelman, Kramer, and Levi, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

140.    Like the 2015 and 2016 10-Ks, in its discussion regarding the Company's Development Agreement with the Singapore Tourism Board, the 2017 10-K stated that Marina Bay Sands "***must comply with comprehensive internal control standards or regulations concerning*** advertising; ***branch office operations***; the location, floor plans and layout of the casino; ***casino operations including casino-related financial transactions and patron disputes, issuance of credit and collection of debt, relationships with and permitted payments to junket operators; security and surveillance***; casino access by Singaporeans

and non-Singaporeans; ***compliance functions and the prevention of money laundering; periodic standard and other reports to the CRA; and those relating to social controls*** including the exclusion of certain persons from the casino." (Emphasis added.)

141.   Regarding certain risk factors related to the operation of the Company's business in Singapore, the 2017 10-K again provided general, broad, and boilerplate language rather than narrowly tailored disclosures in connection to identifiable threats to the Company's business operations such as already realized weaknesses in its casino control measures as well as the Fraudulent Money Transfer Scheme. The 2017 10-K stated that "[c]onducting business in … Singapore has certain political and economic risks, which may have a material adverse effect on our business, financial condition, results of operations and cash flows." Specifically, the 2017 10-K stated the following, in relevant part:

> Current … Singapore laws and regulations concerning gaming and gaming concessions and licenses are, for the most part, fairly recent and there is little precedent on the interpretation of these laws and regulations. ***We believe that our organizational structure and operations are in compliance in all material respects with all applicable laws and regulations of … Singapore***. These laws and regulations are complex and a court or an administrative or regulatory body may in the future render an interpretation of these laws and regulations, or issue regulations, which differs from our interpretation and could have a material adverse effect on our financial condition, results of operations and cash flows.
>
> In addition, our activities in … Singapore are subject to administrative review and approval by various government agencies.

(Emphasis added.)

142.   With respect to the Company's controls and procedures, the 2017 10-K stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of December 31, 2017, and have concluded that they are effective at the reasonable assurance level***.

It should be noted that any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

\* \* \*

There were no changes in the Company's internal control over financial reporting that occurred during the fourth quarter covered by this Annual Report on Form 10-K that had a material effect, or was reasonably likely to have a material effect, on the Company's internal control over financial reporting.

\* \* \*

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. In making this assessment, the Company's management used the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)."

**Based on this assessment, management concluded that, as of December 31, 2017, the Company's internal control over financial reporting is effective based on this framework.**

(Emphasis added.)

### April 20, 2018 Proxy Statement

143.    On April 20, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Gerard, Jamieson, Koppelman, Kramer, and Levi solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

144.    With respect to the Company's Code of Ethics, the 2018 Proxy Statement stated, "[w]e have adopted a Code of Business Conduct and Ethics that applies to all of the Company's directors,

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

officers (including the principal executive officer, principal financial officer and principal accounting officer), employees and agents." Additionally, the 2018 Proxy Statement further provided, "[t]he Code of Business Conduct and Ethics establishes policies and procedures the Board believes promote the highest standards of integrity, compliance with the law and personal accountability. The Company's Code of Business Conduct and Ethics is provided to all new directors, officers and employees."

145. With respect to the Reporting Policy, the 2018 Proxy Statement stated, "[w]e have adopted a Reporting and Non-Retaliation Policy to facilitate and encourage the reporting of any misconduct at the Company, including violations or potential violations of our Code of Business Conduct and Ethics, and to ensure those reporting such misconduct will not be subject to harassment, intimidation or other retaliatory action. The Reporting and Non-Retaliation Policy is provided to all new directors, officers and employees."

146. The 2018 Proxy Statement also called for shareholder approval of, among other things, the material terms of the performance goals under the Las Vegas Sands Corp. Executive Cash Incentive Plan (the "Incentive Compensation Plan"), which would establish a program of incentive compensation awards for designated officers and other key executives of the Company and its subsidiaries and divisions that is directly related to LVSC's performance results and to allow bonus payments made to certain LVSC's executive officers to be tax deductible (the "Performance Goals Proposal").

147. The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and other governance policies were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

148. The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective casino control measures, specifically related to the transfer of patron funds and, as a result, LVSC's casino control measures related to the transfer of patron funds

in its Marina Bay Sands casino located in Singapore contained material weaknesses and deficiencies in breach of the Development Agreement; (2) as a result, LVSC's Marina Bay Sands casino located in Singapore faced an increased risk of the Fraudulent Fund Transfer Scheme; (3) the Fraudulent Fund Transfer Scheme; (4) consequently, the Company was subject to an elevated threat of both investigation and legal action in connection to the Fraudulent Fund Transfer Scheme and also faced heightened regulatory scrutiny and oversight including in Singapore and the United States; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

149.    As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders approved the Performance Goals Proposal.

### April 27, 2018 Form 10-Q

150.    On April 27, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

151.    Regarding risk factors, the 1Q18 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

152.    With respect to the Company's internal controls, the 1Q18 10-Q stated the following, in relevant part:

Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and such information is

accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of March 31, 2018, and have concluded they are effective at the reasonable assurance level.***

It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

* * *

***There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had a material effect, or was reasonably likely to have a material effect, on the Company's internal control over financial reporting.***

(Emphasis added.)

### July 25, 2018 Form 10-Q

153.    On July 25, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

154.    Regarding risk factors, the 2Q18 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

155.    With respect to the Company's internal controls, the 2Q18 10-Q stated the following, in relevant part:

Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of June 30, 2018, and have concluded they are effective at the reasonable assurance level.***

It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

* * *

***There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had a material effect, or was reasonably likely to have a material effect, on the Company's internal control over financial reporting.***

(Emphasis added.)

### October 26, 2018 Form 10-Q

156.    On October 26, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

157.    Regarding risk factors, the 3Q18 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

158.     With respect to the Company's internal controls, the 3Q18 10-Q stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of September 30, 2018, and have concluded they are effective at the reasonable assurance level.***

> It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

> \* \* \*

> ***There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had a material effect, or was reasonably likely to have a material effect, on the Company's internal control over financial reporting.***

(Emphasis added.)

***February 22, 2019 Form 10-K***

159.     On February 22, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 with the SEC (the "2018 10-K"). The 2018 10-K was signed by Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Gerard, Jamieson, Koppelman, Kramer, and Levi, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

160.    Like the 2015, 2016, and 2017 10-Ks, in its discussion regarding the Company's Development Agreement with the Singapore Tourism Board, the 2018 10-K stated that Marina Bay Sands "***must comply with comprehensive internal control standards or regulations concerning*** advertising; ***branch office operations***; the location, floor plans and layout of the casino; ***casino operations including casino-related financial transactions and patron disputes, issuance of credit and collection of debt, relationships with and permitted payments to gaming promoters; security and surveillance***; casino access by Singaporeans and non-Singaporeans; ***compliance functions and the prevention of money laundering; periodic standard and other reports to the CRA; and those relating to social controls*** including the exclusion of certain persons from the casino." (Emphasis added.)

161.    Regarding certain risk factors related to the operation of the Company's business in Singapore, the 2018 10-K again provided general, broad, and boilerplate language rather than narrowly tailored disclosures in connection to identifiable threats to the Company's business operations such as already realized weaknesses in its casino control measures as well as the Fraudulent Money Transfer Scheme. The 2018 10-K stated that "[c]onducting business in … Singapore has certain political and economic risks, which may have a material adverse effect on our business, financial condition, results of operations and cash flows." Specifically, the 2018 10-K stated the following, in relevant part:

> Current … Singapore laws and regulations concerning gaming and gaming concessions and licenses are, for the most part, fairly recent and there is little precedent on the interpretation of these laws and regulations. ***We believe our organizational structure and operations are in compliance in all material respects with all applicable laws and regulations of … Singapore***. These laws and regulations are complex and a court or an administrative or regulatory body may in the future render an interpretation of these laws and regulations, or issue regulations, which differs from our interpretation and could have a material adverse effect on our financial condition, results of operations and cash flows.
>
> In addition, our activities in … Singapore are subject to administrative review and approval by various government agencies.

(Emphasis added.)

162.   With respect to the Company's controls and procedures, the 2018 10-K stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of December 31, 2018, and have concluded they are effective at the reasonable assurance level***.
>
> It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.
>
> * * *
>
> There were no changes in the Company's internal control over financial reporting that occurred during the fourth quarter covered by this Annual Report on Form 10-K that had a material effect, or was reasonably likely to have a material effect, on the Company's internal control over financial reporting.
>
> * * *
>
> The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. In making this assessment, the Company's management used the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)."
>
> ***Based on this assessment, management concluded, as of December 31, 2018, the Company's internal control over financial reporting is effective based on this framework.***

(Emphasis added.)

***April 3, 2019 Proxy Statement***

163.   On April 3, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Gerard, Jamieson,

Koppelman, Kramer, and Levi solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

164.    With respect to the Company's Code of Ethics, the 2019 Proxy Statement stated, "[w]e have a Code of Business Conduct and Ethics, updated effective January 1, 2019, that applies to all of the Company's directors, officers (including the principal executive officer, principal financial officer and principal accounting officer), employees and agents." Additionally, the 2019 Proxy Statement further provided, "[t]he Code of Business Conduct and Ethics establishes policies and procedures the Board believes promote the highest standards of integrity, compliance with the law and personal accountability. The Company's Code of Business Conduct and Ethics is provided to all new directors, officers and employees."

165.    With respect to the Reporting Policy, the 2019 Proxy Statement stated, "[w]e have adopted a Reporting and Non-Retaliation Policy to facilitate and encourage the reporting of any misconduct at the Company, including violations or potential violations of our Code of Business Conduct and Ethics, and to ensure those reporting such misconduct will not be subject to harassment, intimidation or other retaliatory action. The Reporting and Non-Retaliation Policy is provided to all new directors, officers and employees."

166.    The 2019 Proxy Statement also called for shareholder approval of, among other things, the amendment and restatement of the 2004 Equity Award Plan (the "2004 Equity Award Plan"), which would, *inter alia*, extend the 2004 Equity Award Plan for another five years and authorize the Company to add an additional 10 million shares of Company stock to be issued to the Company's officers and

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

directors in connection with performance-based awards (the "2004 Equity Plan Proposal" and, together with the Performance Goal Proposal the "Proposals").

167. The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and other governance policies were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

168. The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective casino control measures, specifically related to the transfer of patron funds and, as a result, LVSC's casino control measures related to the transfer of patron funds in its Marina Bay Sands casino located in Singapore contained material weaknesses and deficiencies in breach of the Development Agreement; (2) as a result, LVSC's Marina Bay Sands casino located in Singapore faced an increased risk of the Fraudulent Fund Transfer Scheme; (3) the Fraudulent Fund Transfer Scheme; (4) consequently, the Company was subject to an elevated threat of both investigation and legal action in connection to the Fraudulent Fund Transfer Scheme and also faced heightened regulatory scrutiny and oversight including in Singapore and the United States; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

169. As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders approved the 2004 Equity Plan Proposal.

### *April 19, 2019 Form 10-Q*

170. On April 19, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material

changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

171.     Regarding risk factors, the 1Q19 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2018."

172.     With respect to the Company's internal controls, the 1Q19 10-Q stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of March 31, 2019, and have concluded they are effective at the reasonable assurance level.***

> It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

> * * *

> ***There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had a material effect, or were reasonably likely to have a material effect, on the Company's internal control over financial reporting.***

(Emphasis added.)

### July 24, 2019 Form 10-Q

173.     On July 24, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants

Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

174.    Regarding risk factors, the 2Q19 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2018."

175.    With respect to the Company's internal controls, the 2Q19 10-Q stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of June 30, 2019, and have concluded they are effective at the reasonable assurance level.***
>
> It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.
>
> * * *
>
> ***There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had a material effect, or were reasonably likely to have a material effect, on the Company's internal control over financial reporting.***

(Emphasis added.)

***October 25, 2019 Form 10-Q***

176.    On October 25, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

177.    Regarding risk factors, the 3Q19 10-Q stated, "[t]here have been no material changes from the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2018."

178.    With respect to the Company's internal controls, the 3Q19 10-Q stated the following, in relevant part:

Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of September 30, 2019, and have concluded they are effective at the reasonable assurance level.***

It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

\* \* \*

***There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that***

*had a material effect, or were reasonably likely to have a material effect, on the Company's internal control over financial reporting.*

(Emphasis added.)

### February 7, 2020 Form 10-K

179.    On February 7, 2020, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2019 with the SEC (the "2019 10-K"). The 2019 10-K was signed by Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Gerard, Jamieson, Koppelman, Kramer, and Levi, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

180.    As in previous 10-K filings with the SEC described above, the 2019 10-K's discussion regarding the Company's Development Agreement with the Singapore Tourism Board, provided that Marina Bay Sands "*must comply with comprehensive internal control standards or regulations concerning* advertising; *branch office operations*; the location, floor plans and layout of the casino; *casino operations including casino-related financial transactions and patron disputes, issuance of credit and collection of debt, relationships with and permitted payments to gaming promoters; security and surveillance*; casino access by Singaporeans and non-Singaporeans; *compliance functions and the prevention of money laundering; periodic standard and other reports to the CRA; and those relating to social controls* including the exclusion of certain persons from the casino." (Emphasis added.)

181.    Regarding certain risk factors related to the operation of the Company's business in Singapore, the 2019 10-K again provided general, broad, and boilerplate language rather than narrowly tailored disclosures in connection to identifiable threats to the Company's business operations such as already realized weaknesses in its casino control measures as well as the Fraudulent Money Transfer Scheme. The 2019 10-K stated that "[c]onducting business in … Singapore has certain political and

economic risks, which may have a material adverse effect on our business, financial condition, results of operations and cash flows." Specifically, the 2019 10-K stated the following, in relevant part:

> Current … Singapore laws and regulations concerning gaming and gaming concessions and licenses are, for the most part, fairly recent and there is little precedent on the interpretation of these laws and regulations. ***We believe our organizational structure and operations are in compliance in all material respects with all applicable laws and regulations of … Singapore***. These laws and regulations are complex and a court or an administrative or regulatory body may in the future render an interpretation of these laws and regulations, or issue regulations, which differs from our interpretation and could have a material adverse effect on our financial condition, results of operations and cash flows.
>
> In addition, our activities in … Singapore are subject to administrative review and approval by various government agencies.

(Emphasis added.)

182.    With respect to the Company's legal proceedings, the 2019 10-K stated that, "[t]he Company is involved in other litigation in addition to" litigation with Asian American Entertainment Corporation, Limited, "arising in the normal course of business." The 2019 10-K further stated that, "[m]anagement has made certain estimates for potential litigation costs based upon consultation with legal counsel" and that although "[a]ctual results could differ from these estimates," the Company's management judged that "such litigation and claims will not have a material effect on the Company's financial condition, results of operations and cash flows." However, the 2019 10-K noticeably did not disclose the Xi Lawsuit, or the threat that lawsuit posed to LVSC's business operations, stature, and economic circumstances, or investigations that could, and, in fact, did arise from the Xi Lawsuit in connection to LVSC's defective casino control measures and the Company's multi-million dollar settlement of the Xi Lawsuit.

183.    With respect to the Company's controls and procedures, the 2019 10-K stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms and such information is accumulated and communicated to

the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of December 31, 2019, and have concluded they are effective at the reasonable assurance level***.

It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

\* \* \*

There were no changes in the Company's internal control over financial reporting that occurred during the fourth quarter covered by this Annual Report on Form 10-K that had a material effect, or was reasonably likely to have a material effect, on the Company's internal control over financial reporting.

\* \* \*

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2019. In making this assessment, the Company's management used the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in "Internal Control — Integrated Framework (2013)."

***Based on this assessment, management concluded, as of December 31, 2019, the Company's internal control over financial reporting is effective based on this framework.***

(Emphasis added.)

***April 1, 2020 Proxy Statement***

184.    On April 1, 2020, the Company filed the 2020 Proxy Statement. Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Jamieson, Koppelman, Kramer, and Levi solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically

185.    With respect to the Company's Code of Ethics, the 2020 Proxy Statement stated, "[w]e have a Code of Business Conduct and Ethics that applies to all of the Company's directors, officers (including the principal executive officer, principal financial officer and principal accounting officer), employees and agents." Additionally, the 2020 Proxy Statement further provided, "[t]he Code of Business Conduct and Ethics establishes policies and procedures the Board believes promote the highest standards of integrity, compliance with the law and personal accountability. The Company's Code of Business Conduct and Ethics is provided to all new directors, officers and employees."

186.    With respect to the Reporting Policy, the 2020 Proxy Statement stated, "[w]e have adopted a Reporting and Non-Retaliation Policy to facilitate and encourage the reporting of any misconduct at the Company, including violations or potential violations of our Code of Business Conduct and Ethics, and to ensure those reporting such misconduct will not be subject to harassment, intimidation or other retaliatory action. The Reporting and Non-Retaliation Policy is provided to all new directors, officers and employees."

187.    The 2020 Proxy Statement also called for shareholder approval of, among other things, the election of 11 directors to the Board.

188.    The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and other governance policies were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Ethics.

189.    The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective casino control measures, specifically related to the transfer of patron funds and, as a result, LVSC's casino control measures related to the transfer of patron funds

_____

disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

in its Marina Bay Sands casino located in Singapore contained material weaknesses and deficiencies in breach of the Development Agreement; (2) as a result, LVSC's Marina Bay Sands casino located in Singapore faced an increased risk of the Fraudulent Fund Transfer Scheme; (3) the Fraudulent Fund Transfer Scheme; (4) consequently, the Company was subject to an elevated threat of both investigation and legal action in connection to the Fraudulent Fund Transfer Scheme and also faced heightened regulatory scrutiny and oversight including in Singapore and the United States; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

190.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders elected Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Jamieson, Koppelman, Kramer, and Levi to the Board, which allowed them to continue breaching their fiduciary duties to the Company.

### April 24, 2020 Form 10-Q

191.    On April 24, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

192.    Regarding risk factors, the 1Q20 10-Q stated, "[i]n addition to the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2019, the following risk factor was identified: ***The COVID-19 Pandemic has adversely affected the number of visitors to our facilities and disrupted our operations, resulting in lower revenues and cash flows. This***

*adverse impact is anticipated to continue until the global COVID-19 Pandemic is contained*." (Emphasis in original.)

193.    With respect to the Company's legal proceedings, the 1Q20 10-Q stated that, "[t]he Company is involved in other litigation in addition to" litigation with Asian American Entertainment Corporation, Limited, "arising in the normal course of business." The 1Q20 10-Q further stated that, "[m]anagement has made certain estimates for potential litigation costs based upon consultation with legal counsel" and that although "[a]ctual results could differ from these estimates," the Company's management judged that "such litigation and claims will not have a material effect on the Company's financial condition, results of operations and cash flows." However, the 1Q20 10-Q noticeably did not disclose the lawsuit that Xi had filed against LVSC, or the threat that lawsuit posed to LVSC's business operations, stature, and economic circumstances, or investigations that could, and, in fact, did arise from the Xi Lawsuit in connection to LVSC's defective casino control measures and the Company's multi-million dollar settlement of that lawsuit.

194.    With respect to the Company's internal controls, the 1Q20 10-Q stated the following, in relevant part:

> Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. ***The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the Company as of March 31, 2020, and have concluded they are effective at the reasonable assurance level.***

> It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

* * *

*There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had a material effect, or were reasonably likely to have a material effect, on the Company's internal control over financial reporting.*

(Emphasis added.)

### July 24, 2020 Form 10-Q

195.    On July 24, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2020 (the "2Q20 10-Q"). The 2Q20 10-Q was signed by Defendants Adelson and Dumont, and contained SOX certifications signed by Defendants Adelson and Dumont attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

196.    Regarding risk factors, the 2Q20 10-Q stated, "[i]n addition to the risk factors previously disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2019, the following risk factor was identified: *The COVID-19 Pandemic has adversely affected the number of visitors to our facilities and disrupted our operations, resulting in lower revenues and cash flows. This adverse impact is anticipated to continue until the global COVID-19 Pandemic is contained*." (Emphasis in original.)

197.    With respect to the Company's internal controls, the 2Q20 10-Q stated the following, in relevant part:

Disclosure controls and procedures are designed to ensure information required to be disclosed in the reports the Company files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and such information is accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate, to allow for timely decisions regarding required disclosure. *The Company's Chief Executive Officer and its Chief Financial Officer have evaluated the disclosure controls and procedures (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) of the*

*Company as of June 30, 2020, and have concluded they are effective at the reasonable assurance level.*

It should be noted any system of controls, however well designed and operated, can provide only reasonable, and not absolute, assurance the objectives of the system are met. In addition, the design of any control system is based in part upon certain assumptions about the likelihood of future events. Because of these and other inherent limitations of control systems, there can be no assurance any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

\* \* \*

*There were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter covered by this Quarterly Report on Form 10-Q that had a material effect, or were reasonably likely to have a material effect, on the Company's internal control over financial reporting.*

(Emphasis added.)

198.    The statements referenced in in ¶¶ 113–142, 150–162, 170–183, and 191–197 herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective casino control measures, specifically related to the transfer of patron funds and, as a result, LVSC's casino control measures related to the transfer of patron funds in its Marina Bay Sands casino located in Singapore contained material weaknesses and deficiencies in breach of the Development Agreement; (2) as a result, LVSC's Marina Bay Sands casino located in Singapore faced an increased risk of the Fraudulent Fund Transfer Scheme; (3) the Fraudulent Fund Transfer Scheme; (4) consequently, the Company was subject to an elevated threat of both investigation and legal action in connection to the Fraudulent Fund Transfer Scheme and also faced heightened regulatory scrutiny and oversight including in Singapore and the United States; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

199.    On July 19, 2020, *Bloomberg News* published an article titled "Sheldon Adelson's Singapore Casino Ends Suit With $6.5 Million Payment," which revealed that the Company had agreed to settle a lawsuit brought by a former patron, Xi, that had alleged that the Company's casino in Singapore illegally transferred S$9.1 million (the equivalent of approximately $6.5 million) to other patrons in 2015 without his approval. Further, the article stated that "[t]he Singapore Police force also investigated [the patron's] complaint" and that "[t]he out-of-court settlement in June ends a dispute that helped trigger probes of the Singapore casino by local authorities." Moreover, *Bloomberg News* reported that the "U.S. Department of Justice is also scrutinizing whether anti-money laundering procedures had been breached in the way the Singapore casino handles high rollers" and that the "Justice Department in January issued a grand jury subpoena to a former compliance chief of Marina Bay Sands, seeking an interview or documents on 'money laundering facilitation' and any abuse of internal financial controls[.]"

200.    On this news, the price of the Company's stock dropped from $48.69 per share at the close of trading on July 17, 2020, the prior trading day, to $47.28 per share at the close of trading on July 20, 2020, representing a loss in value of nearly 2.9%, or $1.41 per share.

201.    Roughly two months later, on September 16, 2020, *Bloomberg News* reported that the Company "hired a law firm to conduct a new investigation into employee transfers of more than $1 billion in gamblers' money to third parties" after "Singapore police began a probe of third-party transfers at Marina Bay Sands Ltd." *Bloomberg News* noted that "the review … adds to scrutiny of the casino by the U.S. Department of Justice and Singapore authorities after a patron sued the firm last year alleging that S$9.1 million ($6.7 million) of his money was transferred to other gamblers without his knowledge. Further, the *Bloomberg News* article cited Singapore's CRA which commented that "'there were weaknesses in [the Company's] casino control measures pertaining to fund transfers'[.]"

202.    The *Bloomberg News* article further stated that the "U.S. Attorney's Office … interviewed a former compliance chief of Marina Bay Sands in July as part of the justice department's probe into whether anti-money laundering procedures had been breached in handling high rollers[.]" The article continued that "[w]hile the junkets are generally more strictly controlled in Singapore, an earlier probe by [the Company] and the Hogan Lovells law firm found instances of employees not complying with proper standards by filling in payment details on pre-signed or photo-copied authorization forms" and further stated that the investigation "also uncovered cases in which original documents were destroyed." Specifically, *Bloomberg News* reported that "[d]uring the Hogan Lovells review covering 2013-2017, more than 3,000 letters of authorization were used to endorse transfers of funds from patrons to third parties worth about S$1.4 billion" and that the Company "called on Hogan Lovells' team … after [Singapore's] Casino Regulatory Authority started its probe following the 2019 lawsuit from patron Wang Xi." The article further stated that "[o]f the transactions scrutinized in the Hogan Lovells review, letters authorizing transfers worth S$365 million from multiple patrons bore signatures that appeared to be similar, facilitating numerous transfers" that "[o]ne group of employees was involved in S$763 million in transfers" and that "concentration in just a handful of staff failed to draw the requisite attention[.]"

203.    *Bloomberg News* further conveyed Singapore's CRA statement stating, "[t]he regulator 'takes a serious view of such matters and had directed [the Company] to strengthen its control measures, which [the Company] has since undertaken'" and that Singapore's CRA "'will continue to exercise close oversight to ensure that [the Company's] measures are effective.'"

204.    Lastly, regarding the Company's statement relating to the "handling of client transfers," *Bloomberg News* mentioned that the Company "thoroughly reviewed the matter and concluded that no patron funds were transferred in a manner that was contrary to the client's intent" and that the Company "'continues to work closely with its regulators to monitor [the Company's] compliance with all legal obligations[.]'" The *Bloomberg News* article stated that the Company "told the regulator that it had

strengthened its control process in April 2018 to ensure that gamblers authorize each fund transfer, and that the requests are approved by the casino's compliance department" and that "[e]mployees also receive training to spot and report suspicious behavior and any unlicensed junket-related activities."

205.    On this news, the price of the Company's stock dropped from $51.85 per share at the close of trading on September 15, 2020, to $49.67 per share at the close of trading on September 16, 2020, representing a loss in value of roughly 4.2%, or $2.18 per share, on heavy trading volume.

### **Repurchases During the Relevant Period**

206.    During the period in which the Company made false and or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company, which overpaid an aggregate amount of nearly $357.6 million for repurchases of its own stock during the Relevant Period.

207.    According to the 1Q17 10-Q, during February 2017, the Individual Defendants caused the Company to repurchase 994,182 shares of its own common stock at an average price per share of approximately $52.80, for a total cost to the Company of approximately $52.5 million.

208.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.13 more than the actual worth of each share during February 2017. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during February 2017 was over $3.1 million.

209.    According to the 1Q17 10-Q, during March 2017, the Individual Defendants caused the Company to repurchase 1,729,300 shares of its own common stock at an average price per share of approximately $56.37, for a total cost to the Company of approximately $97.5 million.

210.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $6.70

more than the actual worth of each share during March 2017. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during March 2017 was approximately $11.6 million.

211.     According to the 2Q17 10-Q, during May 2017, the Individual Defendants caused the Company to repurchase 436,100 shares of its own common stock at an average price per share of approximately $57.30, for a total cost to the Company of nearly $25.0 million.

212.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $7.63 more than the actual worth of each share during May 2017. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during May 2017 was approximately $3.3 million.

213.     According to the 2Q17 10-Q, during June 2017, the Individual Defendants caused the Company to repurchase 774,155 shares of its own common stock at an average price per share of approximately $64.60, for a total cost to the Company of approximately $50.0 million.

214.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $14.93 more than the actual worth of each share during June 2017. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during June 2017 was approximately $11.6 million.

215.     According to the 3Q17 10-Q, during September 2017, the Individual Defendants caused the Company to repurchase 1,173,500 shares of its own common stock at an average price per share of approximately $63.90, for a total cost to the Company of nearly $75.0 million.

216.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $14.23

more than the actual worth of each share during September 2017. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during September 2017 was nearly $16.7 million.

217.    According to the 2017 10-K, during November 2017, the Individual Defendants caused the Company to repurchase 583,100 shares of its own common stock at an average price per share of approximately $68.58, for a total cost to the Company of nearly $40.0 million.

218.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $18.91 more than the actual worth of each share during November 2017. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during November 2017 was approximately $11.0 million.

219.    According to the 2017 10-K, during December 2017, the Individual Defendants caused the Company to repurchase 503,800 shares of its own common stock at an average price per share of approximately $69.45, for a total cost to the Company of nearly $35.0 million.

220.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $19.78 more than the actual worth of each share during December 2017. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during December 2017 was nearly $10.0 million.

221.    According to the 1Q18 10-Q, during February 2018, the Individual Defendants caused the Company to repurchase 1,048,200 shares of its own common stock at an average price per share of approximately $71.54, for a total cost to the Company of nearly $75.0 million.

222.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $21.87

more than the actual worth of each share during February 2018. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during February 2018 was over $22.9 million.

223.    According to the 2Q18 10-Q, during June 2018, the Individual Defendants caused the Company to repurchase 1,253,600 shares of its own common stock at an average price per share of approximately $79.76, for a total cost to the Company of nearly $100.0 million.

224.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $30.09 more than the actual worth of each share during June 2018. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during June 2018 was over $37.7 million.

225.    According to the 3Q18 10-Q, during August 2018, the Individual Defendants caused the Company to repurchase 2,646,290 shares of its own common stock at an average price per share of approximately $68.01, for a total cost to the Company of nearly $180.0 million.

226.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $18.34 more than the actual worth of each share during August 2018. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during August 2018 was over $48.5 million.

227.    According to the 3Q18 10-Q, during September 2018, the Individual Defendants caused the Company to repurchase 1,955,474 shares of its own common stock at an average price per share of approximately $61.34, for a total cost to the Company of over $119.9 million.

228.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $11.67 more than the actual worth of each share during September 2018. Thus, the total over payment by the

Company for repurchases of its own stock within the Relevant Period during September 2018 was over $22.8 million.

229.     According to the 2018 10-K, during October 2018, the Individual Defendants caused the Company to repurchase 1,567,151 shares of its own common stock at an average price per share of approximately $51.05, for a total cost to the Company of over $80.0 million.

230.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $1.38 more than the actual worth of each share during October 2018. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during October 2018 was approximately $2.2 million.

231.     According to the 2018 10-K, during November 2018, the Individual Defendants caused the Company to repurchase 4,616,700 shares of its own common stock at an average price per share of approximately $53.07, for a total cost to the Company of over $245.0 million.

232.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.40 more than the actual worth of each share during November 2018. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during November 2018 was approximately $15.7 million.

233.     According to the 2018 10-K, during December 2018, the Individual Defendants caused the Company to repurchase 1,910,712 shares of its own common stock at an average price per share of approximately $54.95, for a total cost to the Company of nearly $105.0 million.

234.     Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $5.28 more than the actual worth of each share during December 2018. Thus, the total over payment by the

Company for repurchases of its own stock within the Relevant Period during December 2018 was approximately $10.1 million.

235.    According to the 1Q19 10-Q, during February 2019, the Individual Defendants caused the Company to repurchase 2,041,647 shares of its own common stock at an average price per share of approximately $61.22, for a total cost to the Company of nearly $125.0 million.

236.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $11.55 more than the actual worth of each share during February 2019. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during February 2019 was approximately $23.6 million.

237.    According to the 1Q19 10-Q, during March 2019, the Individual Defendants caused the Company to repurchase 818,317 shares of its own common stock at an average price per share of approximately $59.98, for a total cost to the Company of approximately $49.1 million.

238.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $10.31 more than the actual worth of each share during March 2019. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during March 2019 was over $8.4 million.

239.    According to the 2Q19 10-Q, during May 2019, the Individual Defendants caused the Company to repurchase 1,397,767 shares of its own common stock at an average price per share of approximately $57.23, for a total cost to the Company of nearly $80.0 million.

240.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $7.56 more than the actual worth of each share during May 2019. Thus, the total over payment by the Company

for repurchases of its own stock within the Relevant Period during May 2019 was approximately $10.6 million.

241.    According to the 2Q19 10-Q, during June 2019, the Individual Defendants caused the Company to repurchase 1,794,800 shares of its own common stock at an average price per share of approximately $55.71, for a total cost to the Company of nearly $100.0 million.

242.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $6.04 more than the actual worth of each share during June 2019. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during June 2019 was over $10.8 million.

243.    According to the 3Q19 10-Q, during August 2019, the Individual Defendants caused the Company to repurchase 644,104 shares of its own common stock at an average price per share of approximately $54.34, for a total cost to the Company of nearly $35.0 million.

244.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $4.67 more than the actual worth of each share during August 2019. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during August 2019 was approximately $3.0 million.

245.    According to the 3Q19 10-Q, during September 2019, the Individual Defendants caused the Company to repurchase 1,177,322 shares of its own common stock at an average price per share of approximately $55.21, for a total cost to the Company of nearly $65.0 million.

246.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $5.54 more than the actual worth of each share during September 2019. Thus, the total over payment by the

Company for repurchases of its own stock within the Relevant Period during September 2019 was approximately $6.5 million.

247.    According to the 2019 10-K, during December 2019, the Individual Defendants caused the Company to repurchase 4,682,678 shares of its own common stock at an average price per share of approximately $64.07, for a total cost to the Company of approximately $300.0 million.

248.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $14.40 more than the actual worth of each share during December 2019. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during December 2019 was over $67.4 million.

## DAMAGES TO LVSC

249.    As a direct and proximate result of the Individual Defendants' conduct, LVSC has lost and will continue to lose and expend many millions of dollars.

250.    Such losses include the Company's overpayment by nearly $357.6 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

251.    Such expenditures include, but are not limited to, legal fees associated with the Xi Lawsuit, which the Company agreed to settle for approximately $6.5 million, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

252.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its Chairman and CEO, and its Executive Vice President and CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

253.    Such expenditures include, but are not limited to costs associated with the costs of defending investigations of and legal fees associated with any litigation resulting from the Fraudulent Money Transfer Scheme and for fines or other monies paid in connection thereto.

254.    These expenditures also include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

255.    Additionally, these expenditures include costs associated with remediating the deficiencies in the Company's disclosure controls, internal controls, and casino control measures described herein.

256.    As a direct and proximate result of the Individual Defendants' conduct, LVSC has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, and unjust enrichment.

## DERIVATIVE ALLEGATIONS

257.    Plaintiff brings this action derivatively and for the benefit of LVSC to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of LVSC, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange Act, as well as the aiding and abetting thereof.

258.    LVSC is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

259.    Plaintiff is, and has been at all relevant times, a shareholder of LVSC. Plaintiff will adequately and fairly represent the interests of LVSC in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

260.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

261.    A pre-suit demand on the Board of LVSC is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eleven individuals: Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Jamieson, Koppelman, Kramer, and Levi (the "Director-Defendants") and non-party Xuan Yan (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven Directors who are on the Board at the time this action is commenced.

262.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material facts, while at least one of them engaged in insider sales based on material non-public information and while they caused the Company to repurchase its own stock at artificially inflated prices, all of which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

263.    Demand is also excused as to all of the Director-Defendants because the Fraudulent Money Transfer Scheme was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

264.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly made and/or caused the Company to make the materially false and misleading statements alleged herein. While investors were duped into believing the fraud perpetrated by the Individual Defendants, at least one of the Director-Defendants sold Company stock at artificially inflated prices based

on inside material information. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

265.    Demand is excused as to the Director-Defendants because they breached their fiduciary duty to the Company—for which they face a substantial likelihood of liability—by causing the Company to pay Defendants Adelson, Dumont, and Goldstein their annual salary, stock awards, option awards, non-equity incentive plan compensation, and/or all other compensation each year that they violated the Company's policies. Indeed, the Fraudulent Money Transfer Scheme described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.

266.    Moreover, Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Gerard, Jamieson, Koppelman, Kramer, and Levi caused the 2019 Proxy Statements to call for a shareholder vote to approve the 2004 Equity Plan Proposal, which provided for the grant of stock and cash-based performance awards for officers and directors, including Defendants Adelson, Dumont, and Goldstein. The misrepresentations and omissions set forth herein were material to shareholders in voting on the 2004 Equity Plan Proposal who would not have approved the 2004 Equity Plan Proposal, had they been informed about the Fraudulent Money Transfer Scheme. As a result of shareholder approval of the 2004 Equity Plan Proposal, Defendants Adelson, Dumont, and Goldstein undeservedly received approximately $24,680,118, $2,413,388, and $8,333,800, respectively, in compensation including performance-based stock awards during the fiscal year ended December 31, 2019; and Defendants Chafetz, Chau, Forman, Gerard, Jamieson, Koppelman, Kramer, and Levi undeservedly received handsome compensation, including in stock awards, as described herein during the fiscal year ended December 31, 2019. For this reason too, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

267.     Additional reasons that demand on Defendant Adelson is futile follow. Defendant Adelson is the founder of the Company, and has served as the Company's Chairman, CEO, and Treasurer since August 2004 when the Company was founded. Additionally, according to the 2020 Proxy Statement, as of March 16, 2020, Defendant Adelson, together with his wife, Dr. Miriam Adelson (who has supposedly worked for the Company, along with Defendant Adelson's stepdaughter, in exchange for thousands of dollars), and their family members, beneficially owned 432,360,530 shares of the Company's common stock, which represented 56.6% of the Company's outstanding common stock as of March 16, 2020, rendering him and his family controlling shareholders. Thus, as the Company admits, Defendant Adelson is a non-independent director. The Company provides Defendant Adelson with his principal occupation, and he receives handsome compensation, including $24,680,118 in 2019 for his services. Defendant Adelson was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in each of the Company's SEC filings referenced herein, including the 2015, 2016, 2017, 2018, and 2019 10-Ks which he either personally made or signed off on and also signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Adelson engaged in and/or permitted despite being aware of it) or the Company's engagement in the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Adelson is a defendant in the Securities Class Action. For these reasons, Defendant Adelson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

268.     Additional reasons that demand on Defendant Dumont is futile follow. Defendant Dumont has served as the Company's Executive Vice President and CFO since March 2016 and a Company director since April 2017. Defendant Dumont has also served as the Company's Principal Financial officer

since February 23, 2016. Previously, he served as the Company's Senior Vice President, Finance and Strategy from September 2013 until March 2016 and as the Company's Vice President, Corporate Strategy from June 2010 until August 2013. Mr. Dumont is the son-in-law of Defendant Adelson. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Dumont with his principal occupation and he receives handsome compensation, including $2,413,388 in 2019 for his services. As a trusted Company officer and director, he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Dumont engaged in and/or permitted despite being aware of it) or scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Dumont signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks, which he signed and signed SOX certifications for. Moreover, Defendant Dumont is a defendant in the Securities Class Action. For these reasons, Defendant Dumont breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

269. Additional reasons that demand on Defendant Goldstein is futile follow. Defendant Goldstein has served as the Company's President and Chief Operating Officer and as a Company director since January 2015. Defendant Goldstein joined the Company in 1995. Previously, he served as the Company's President of Global Gaming Operations from January 2011 until December 2014, as the Company's Executive Vice President from July 2009 until December 2014, and as the Company's Secretary from August 2016 until November 2016. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Goldstein with his principal occupation and he has received and continues to receive handsome compensation, including $8,333,800 in the year ended December 31, 2019, for his services. As a trusted Company officer and director, he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Goldstein engaged in and/or permitted despite

being aware of it) or the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $13.6 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Goldstein signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Goldstein breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

270.    Additional reasons that demand on Defendant Chafetz is futile follow. Defendant Chafetz has served as a Company director since February 2005. Defendant Chafetz has business and personal relationships with Defendant Adelson. Specifically, Defendant Chafetz was a stockholder, vice president, and director of the entity that owned and operated the COMDEX trade show and The Sands Expo and Convention Center, which were created and developed by Defendant Adelson. Defendant Chafetz is also a trustee of several trusts for the benefit of Defendant Adelson's family, including trusts that beneficially own shares of the Company's common stock. Defendant Chafetz also has made joint investments and has other significant financial dealings with Defendant Adelson. Thus, as the Company admits, he is a non-independent director. Moreover, with 33.4% of the company's voting power as of March 16, 2020, Defendant Chafetz is a controlling shareholder. Defendant Chafetz has received and continues to receive handsome compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Chafetz engaged in and/or permitted despite being aware of it) or the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Chafetz signed, and thus personally made the false and misleading statements in

the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Chafetz breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

271.    Additional reasons that demand on Defendant Chau is futile follow. Defendant Chau has served as a Company director since October 2014. She also serves as a member of the Audit Committee and as a member of the Compensation Committee. Defendant Chau has received and continues to receive handsome compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Chau engaged in and/or permitted despite being aware of it) or the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Chau signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Chau breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

272.    Additional reasons that demand on Defendant Forman is futile follow. Defendant Forman has served as a Company director since October 2014. Defendant Forman has business and personal relationships with Defendant Adelson. Specifically, Defendant Forman was vice president and general counsel of the entity that owned and operated the COMDEX trade show and the Sands Expo and Convention Center, which were created and developed by Defendant Adelson. Thus, as the Company admits, he is a non-independent director. Defendant Forman has received and continues to receive handsome compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Forman engaged in and/or permitted despite being aware of it) or the scheme to cause the Company to make false

and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Forman signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Forman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

273.   Additional reasons that demand on Defendant Jamieson is futile follow. Defendant Jamieson has served as a Company director since June 2014. He also serves as the Chair of the Compliance Committee and as a member of the Audit Committee. Previously, he served as the Chair of the Audit Committee. Defendant Jamieson has received and continues to receive handsome compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Jamieson engaged in and/or permitted despite being aware of it) or the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Jamieson signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Jamieson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

274.   Additional reasons that demand on Defendant Koppelman is futile follow. Defendant Koppelman has served as a Company director since October 2011. He also serves as the Chair of the Compensation Committee, as a member of the Nominating and Governance Committee, and as a member of the Compliance Committee. Previously, he served as a member of the Compensation Committee. Defendant Koppelman has received and continues to receive handsome compensation for his role as a

director as described above. As a trusted Company director, he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Koppelman engaged in and/or permitted despite being aware of it) or the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Koppelman signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Koppelman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

275.    Additional reasons that demand on Defendant Kramer is futile follow. Defendant Kramer has served as a Company director since April 2017. He also serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. Previously, he served as a member of the Audit Committee. Defendant Kramer has received and continues to receive handsome compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Kramer engaged in and/or permitted despite being aware of it) or the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kramer signed, and thus personally made the false and misleading statements in the 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Kramer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

276.    Additional reasons that demand on Defendant Levi is futile follow. Defendant Levi has served as a Company director since January 2015. He also serves as the Chair of the Nominating and

Governance Committee, as a member of the Compensation Committee, and as a member of the Compliance Committee. Defendant Levi has received and continues to receive handsome compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Defendant Levi engaged in and/or permitted despite being aware of it) or the Company's scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Levi signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Levi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

277.    Additional reasons that demand on non-party Yan is futile follow. Non-party Yan has served as a Company director since September 17, 2019. He also serves as a member of the Audit Committee and as a member of the Compliance Committee. On December 23, 2020, the Company filed a current report on Form 8-K with the SEC in which Yan stated that he "greatly enjoyed working with the Company, and the Board and the management team, that he was extremely proud of his associations with the Company because it is such a well-run and socially responsible organization[.]" Yan is clearly complicit in the Individual Defendants scheme as alleged herein and therefore is beholden to the Individual Defendants. Yan has received and continues to receive handsome compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Fraudulent Money Transfer Scheme (which Yan permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Yan signed, and thus personally made the false and misleading statements

in the 2019 10-K. For these reasons, too, non-party Yan breached his fiduciary duties, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

278.    Additional reasons that demand on the Board is futile follow.

279.    As the Company acknowledges, Defendant Adelson exercises significant influence over the business polices and affairs of LVSC, including the composition of the Board any action requiring the approval of the Company's stockholders, including the adoption of amendments to the Company's articles of incorporation and the approval of a merger or sale of substantially all of the Company's assets. The Company acknowledges that the concentration of ownership may also delay, defer or even prevent a change in control of the Company and may make some transactions more difficult or impossible without the support of Defendant Adelson. Additionally, the Company admits that the interests of Defendant Adelson may differ from that of other individuals including LVSC investors. As a result, the Company's Directors are beholden to Defendant Adelson. Defendant Adelson and his family control 56.6% as of the Company's outstanding stock and, consequently, the controlling share of the voting power in the Company as of March 16, 2020. Thus, they have considerable influence over whether each Board member will retain their seat on the Board in the next Board election. Defendant Adelson's domination and control over the Board is not just hypothetical. In fact, Defendant Adelson has previously demonstrated his willingness to exert control over LVSC's management merely for disagreeing with him when, in 2009, he caused the Company to force the resignation of its then-President and COO William Weidner ("Weidner"), whose tenure at the Company spanned approximately 14 years, for questioning his operation of the Company, and/or refusing to execute Defendant Adelson's unlawful directives. Weidner later testified under oath that Defendant Adelson had pressured the members of the Board at the time to ask for his resignation. Defendant Weidner also testified that Defendant Adelson fired Weidner for cause after he had agreed to resign. Further, in 2010, Defendant Adelson had terminated Steven C. Jacobs ("Jacobs"), the then-CEO of Sands China Ltd., a subsidiary of LVSC, for raising concerns over the Company's and, in particular,

Defendant Adelson's questionable and illegal activities including instructing Jacobs to secretly investigate certain government officials.

280.     As described above, at least one of the Director-Defendants directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendant Goldstein received proceeds of over $13.6 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to Defendant Goldstein, and excused.

281.     Defendants Chau, Jamieson, and Kramer (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, the performance of the Company's internal audit function, and the Company's compliance with applicable laws and regulations. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC and to fail to maintain internal controls. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

282.     Defendants Jamieson, Koppelman, and Levi (the "Compliance Committee Defendants") served on the Company's Compliance Committee during the Relevant Period. Pursuant to the Company's Compliance Committee Charter, the Compliance Committee Defendants were responsible for overseeing, *inter alia*, the performance of the Company's compliance with the laws and regulations applicable to the Company's business including gaming laws and the Company's compliance with the Code of Ethics and other governance policies including the Company's Anti-Money Laundering Policy, and the Reporting Policy. The Compliance Committee Defendants failed to ensure the Company's compliance with applicable laws and regulations and the Company's governance policies, as they are charged to do under

the Compliance Committee Charter, allowing the Company to engage in and/or permit the Fraudulent Money Transfer Scheme. Thus, the Compliance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

283.    Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by nearly $357.6 million for its own common stock during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

284.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Dumont is Defendant Adelson's son-in-law and has worked at the Company for nearly a decade. Further, Defendants Adelson has been the President and Chairman of Interface Group Holding Company, Inc. and its predecessors since the mid-1970s and is a manager of Interface Group-Massachusetts, LLC ("IGM"), an entity controlled by Defendant Adelson, and was president of its predecessors since 1990 while Defendant Chafetz has served as a Manager of The Interface Group, LLC, which controls the IGM, where he reported to Defendant Adelson. Defendant Chafetz has been associated with the IGM and its predecessors since 1972. In fact, on January 17, 2008, *The New York Times* published an article detailing the relationship between Defendants Adelson and Chafetz and described Defendant Chafetz as a "former business partner who has known [Defendant] Adelson since grade school." Another publication reported that Defendant Chafetz is a "lifelong friend of [Defendant] Adelson" and that they started a charter tours business together as early

as in the 1960s. Indeed, Defendant Chafetz serves as the trustee of several trusts for the benefit of Defendant Adelson's family members. Furthermore, Defendant Chafetz served as an officer of IGM and as Vice President and as a director of Interface Group-Nevada, Inc. ("IGN"), an entity controlled by Defendant Adelson, from 1989 to 1995 while Defendant Forman served as Vice President and General Counsel of IGN during that same time period. IGN owned COMDEX, and the Sands Expo and Convention Center, both of which were created and developed by Defendant Adelson. Defendant Chafetz served as the Chair and as a Trustee of a non-profit organization, Campaign for Hebrew SeniorLife, an organization which named its Dedham, MA campus after Defendant Adelson and his wife donated a gift of approximately $15 million dollars in support of its mission. These conflicts of interest, among others, precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.

285.   In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of the Exchange Act. Moreover, in violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

286.   LVSC has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for LVSC any part of the damages

LVSC suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

287. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

288. The acts complained of herein constitute violations of fiduciary duties owed by LVSC's officers and directors, and these acts are incapable of ratification.

289. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of LVSC. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of LVSC, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

290.     If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause LVSC to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

291.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

292.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

293.     The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

294.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

295.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which

it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

296.    Under the direction and watch of the Director-Defendants, the 2018 Proxy Statement, 2019 Proxy Statement, and 2020 Proxy Statement (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective casino control measures, specifically related to the transfer of patron funds and, as a result, LVSC's casino control measures related to the transfer of patron funds in its Marina Bay Sands casino located in Singapore contained material weaknesses and deficiencies in breach of the Development Agreement; (2) as a result, LVSC's Marina Bay Sands casino located in Singapore faced an increased risk of the Fraudulent Fund Transfer Scheme; (3) the Fraudulent Fund Transfer Scheme; (4) consequently, the Company was subject to an elevated threat of both investigation and legal action in connection to the Fraudulent Fund Transfer Scheme and also faced heightened regulatory scrutiny and oversight including in Singapore and the United States; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

297.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

298.    Moreover, the Proxy Statements was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

299.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, ratification of an independent auditor, and approval of the Proposals.

300.    The false and misleading elements of the Proxy Statements led to the approval of the Incentive Compensation Plan and to the re-election of Defendants Adelson, Dumont, Goldstein, Chafetz, Chau, Forman, Gerard, Jamieson, Koppelman, Kramer, and Levi to the Board, which allowed them to continue breaching their fiduciary duties to LVSC.

301.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

302.    Plaintiff on behalf of LVSC has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Exchange Act

303.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

304.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding LVSC. Not only is LVSC now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon LVSC by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over $2.0 billion of its own shares on the open market at artificially-inflated prices, damaging LVSC.

305.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

306.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about LVSC not misleading.

307.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by LVSC. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

308.     In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, made and signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

309.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

310.   Plaintiff on behalf of LVSC has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Violations of
### Section 20(a) of the Exchange Act

311.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

312.   The Individual Defendants, by virtue of their positions with LVSC and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of LVSC and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause LVSC to engage in the illegal conduct and practices complained of herein.

313.   Plaintiff on behalf of LVSC has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

314.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

315.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of LVSC's business and affairs.

316.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

317.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants

intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of LVSC.

318.  In breach of their fiduciary duties, the Individual Defendants either engaged in or permitted, and/or allowed the Company to engage in the Fraudulent Money Transfer Scheme.

319.  In further breach of their fiduciary duties owed to LVSC, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to design, implement, and maintain effective casino control measures, specifically related to the transfer of patron funds and, as a result, LVSC's casino control measures related to the transfer of patron funds in its Marina Bay Sands casino located in Singapore contained material weaknesses and deficiencies in breach of the Development Agreement; (2) as a result, LVSC's Marina Bay Sands casino located in Singapore faced an increased risk of the Fraudulent Fund Transfer Scheme; (3) the Fraudulent Fund Transfer Scheme; (4) consequently, the Company was subject to an elevated threat of both investigation and legal action in connection to the Fraudulent Fund Transfer Scheme and also faced heightened regulatory scrutiny and oversight including in Singapore and the United States; and (5) the Company failed to maintain disclosure controls and internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

320.  The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

321.  In breach of their fiduciary duties, at least one of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

322.    In further breach of their fiduciary duties owed to LVSC, the Individual Defendants willfully or recklessly caused the Company to repurchase over $2.0 billion worth of Company stock at artificially inflated prices.

323.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain effective disclosure controls and procedures, internal controls, and casino control measures.

324.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of LVSC's securities and disguising insider sales.

325.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of LVSC's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

326.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

327.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, LVSC has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

328.    Plaintiff on behalf of LVSC has no adequate remedy at law.

### FIFTH CLAIM

**Against Individual Defendants for Unjust Enrichment**

329.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

330.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, LVSC.

331.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from LVSC that was tied to the performance or artificially inflated valuation of LVSC, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

332.    Plaintiff, as a shareholder and a representative of LVSC, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

333.    Plaintiff on behalf of LVSC has no adequate remedy at law.

### SIXTH CLAIM

**Against Individual Defendants for Waste of Corporate Assets**

334.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

335.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

336.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

337.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused LVSC to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

338.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

339.    Plaintiff on behalf of LVSC has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Abuse of Control

340.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

341.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence LVSC, for which they are legally responsible.

342.    As a direct and proximate result of the Individual Defendants' abuse of control, LVSC has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, LVSC has sustained and continues to sustain

significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

343.    Plaintiff on behalf of LVSC has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Gross Mismanagement

344.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

345.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of LVSC in a manner consistent with the operations of a publicly-held corporation.

346.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, LVSC has sustained and will continue to sustain significant damages.

347.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

348.    Plaintiff, on behalf of LVSC, has no adequate remedy at law.

## NINTH CLAIM

### Against Defendants Adelson and Dumont for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

349.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

350.    LVSC, along with Defendants Adelson and Dumont are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws,

the Company's liability will be in whole or in part due to Defendants Adelson and Dumont's willful and/or reckless violations of their obligations as officers and/or directors of LVSC.

351.    Defendants Adelson and Dumont, because of their positions of control and authority as officers and/or directors of LVSC, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of LVSC, including the wrongful acts complained of herein and in the Securities Class Action.

352.    Accordingly, Defendants Adelson and Dumont are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

353.    As such, LVSC is entitled to receive all appropriate contribution or indemnification from Defendants Adelson and Dumont.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of LVSC, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to LVSC;

(c)    Determining and awarding to LVSC the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing LVSC and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and

to protect LVSC and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

      2. a provision to permit the shareholders of LVSC to nominate at least six candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)     Awarding LVSC restitution from Individual Defendants, and each of them;

    (f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: December 28, 2020

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown

Respectfully submitted,

**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

*Counsel for Plaintiff*

240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Verified Amended Shareholder Derivative Complaint